## In re ENERGY COOPERATIVE, INC., Debtor.

Nos. 81 B 5811, 92 C 2392, 92 C 4315–92 C 4317 and 93 C 1949.

United States District Court, N.D. Illinois, Eastern Division.

July 22, 1994.

J. Mark Fisher, Ann Rae Heitland, Eric Lewis Lohrenz, Gabriel M. Rodriguez, Thomas J. Pauloski, Michael L. Kayman, Schiff, Hardin & Waite, Chicago, IL, for Atlantic Richfield Co., in No. 92 C 2392.

Glen H. Kanwit, Michael B. Solow, Debbie J. Gezon, Hopkins & Sutter, P.C., Chicago, IL, for Energy Co-op., Inc., in No. 92 C 2392, Jay A. Steinberg, in Nos. 92 C 4316 and 92 C 4317.

Thomas J. Shannon, Jeffrey Grant Brown, Law Office of Thomas J. Shannon, Ltd., Chicago, IL, for Syntra Inc., in No. 93 C 4315.

Michael James Philippi, William T. McCartan, Coffield, Ungaretti and Harris, Chicago, IL, for F.M.L. Mfrs., Inc., in No. 93 C 4315.

Michael B. Solow, Richard M. Fogel, Hopkins & Sutter, P.C., Chicago, IL, for Jay A. Steinberg, in No. 93 C 1949.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is before the Court on various motions, all stemming from the entry of two proposed settlement agreements which purport to settle environmental claims relating to environmental damage at the Debtor's former refinery in East Chicago and Hammond, Indiana.

## BACKGROUND

After ten years of negotiation and planning, this matter is finally before us for approval of two proposed settlement agreements and one interim distribution motion. The two proposed agreements before us purport to settle the Debtor's liabilities and all environmental claims relating to the environmental damage at the ECI Facility, the Debtor's former refinery in East Chicago and Hammond, Indiana ("the Facility"). The damage at the Facility includes, among other things, several million gallons of contaminated oil-based hydrocarbons that float atop the groundwater beneath the Facility. These hydrocarbons, along with PCB-contaminated oil, continue to discharge into the Indiana Harbor Ship Canal.

The Debtor, ECI, first acquired the refinery in 1976. From approximately 1917 through 1968, Sinclair Refining Company ("Sinclair") owned and operated the Facility as a refinery. In 1968, Atlantic Richfield Company ("ARCO"), the corporate successor to Sinclair, became the owner and operator of the Facility, and continued operations until 1976.[1] ECI acquired the Facility from ARCO in May 1976 and actively operated the Facility until May 15, 1981. ECI was a "regional agricultural cooperative" of eight cooperatives, consisting of the "Member–Owners."[2] ECI was formed for the purpose of securing a supply of refined petroleum products for the businesses of the Member–Owners. The Member Owners were the shareholders of ECI, as well as its principal customers.

On May 15, 1981 ECI filed for reorganization protection under Chapter 11 of the Bankruptcy Code. ECI acted as debtor-in-possession until May 31, 1984 when the case was converted into a Chapter 7 liquidation. Jay A. Steinberg ("the Trustee") was ap-

---

1. ARCO and its corporate predecessors owned and operated the refinery facility for 59 of the 64 years of the Facility's operation.

2. The "Member–Owners" are Farmers Union Central Exchange, Inc.; Farmers Petroleum Cooperative, Inc.; Landmark, Inc.; Land O'Lakes, Inc.; FCX, Inc., MFA Oil Company; and Tennessee Farmers Cooperative.

pointed as trustee in bankruptcy. In December 1989, the ECI bankruptcy estate, upon this Court's approval, conveyed most of the refinery facility to the City of East Chicago through the East Chicago Property Improvement Corporation.

Both the United States and the State of Indiana filed separate proof of claims against ECI in May 1992, alleging that ECI was liable to each of them for past and future environmental response cost at the ECI facility.[3] The United States and Indiana allege that certain hazardous substances, as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation Liability Act, ("CERCLA") 42 U.S.C. § 9601(14), and Section 13–7–8.7 of the Indiana Code, were disposed of, and have been detected at the ECI Facility.

Presently before us are various motions to approve two settlement agreements and one interim distribution order. First, both the United States government and the Trustee move for entry of a settlement agreement (hereinafter "the United States' Settlement Agreement") which relates to environmental claims and rights asserted by the United States and the State of Indiana under CERCLA and other federal and state environmental statutes. The United States moves for approval of the settlement agreement under environmental laws, while the Trustee moves for approval of this agreement under the Bankruptcy Code. Second, the Trustee moves for entry of a settlement agreement (hereinafter "the Member–Owner Settlement Agreement") which purports to settle the claims between the Debtor's Estate, the Member–Owners and CF Industries, Inc. The Trustee moves for approval of the Member–Owner Settlement Agreement under the Bankruptcy Code. Finally, the third motion before us is the Trustee's motion for authorization of an interim distribution of funds to general unsecured creditors (hereinafter "interim distribution motion").

All interested parties have been allowed an opportunity to respond to each motion. The substantive issues raised by each pending motion and its corresponding objections will be addressed below.

## DISCUSSION

**I. The United States government's motion for approval of the United States' Settlement Agreement under environmental laws**

The United States government filed a motion to approve its proposed Settlement Agreement which purports to settle environmental claims among the ECI Estate, the Member–Owners, CF Industries and the relevant federal and state governmental agencies.[4] The proposed agreement relates to the environmental claims asserted by the United States and Indiana under CERCLA and other federal and state environmental statutes.

The relevant terms of the United States' Settlement Agreement are as follows. The ECI Estate will pay $13.5 million in cash for response costs and natural resource damages at the ECI Facility. The amount $13,220,-000.00 will be paid to the ECI Facility Trust Fund[5] pursuant to CERCLA and the Indiana Petroleum Release Statute for funding of response actions at the ECI Facility. In the event that ECI receives insurance proceeds for its environmental liabilities, ECI will pay up to an additional $2.0 million to the ECI Trust Fund, representing 25% of the net proceeds from the insurance. The government agencies, in turn, covenant not to seek civil relief against the Debtor, the

---

**3.** Both the United States and Indiana maintain (1) that their claims have administrative priority under the Bankruptcy Code; (2) that ECI is jointly and severally liable with other potentially responsible parties ("PRP's") for response costs incurred in connection with the ECI Facility; (3) and that ECI also has injunctive cleanup obligations with which it is required to comply.

**4.** These claims were asserted by the U.S. government on behalf of the following agencies: the

U.S. Environmental Protection Agency; the U.S. Coast Guard; the U.S. Department of the Interior; and the State of Indiana (on behalf of the Indiana Department of Environmental Management and the Indiana Department of Natural Resources).

**5.** The settlement agreement provides for the administration of the trust fund.

Estate, the Trustee, the Member–Owners or the Special Master under specified federal environmental statutes and certain provisions of the Indiana Code, "for any liability whether known or unknown" with respect to the ECI Facility. The agreement further provides that the Trustee, the Debtor, ECI and the Estate will retain all rights available to them to seek indemnification or contribution from other parties for or toward the amounts paid pursuant to the EPA settlement Agreement. In moving for entry of its proposed settlement agreement, the United States argues that the proposed agreement is fair, reasonable and lawful under both federal and state environmental laws.[6]

### Standard of Review

■ The relevant inquiry in reviewing environmental settlements is whether the settlement is "fair, reasonable and faithful to the objectives of the governing statute." *United States v. Cannons Engineering,* 899 F.2d 79, 84 (1st Cir.1990); *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1424 (6th Cir.1991). While the district court is afforded discretion in reviewing environmental settlements, this discretion is to be exercised in a limited and deferential manner in favor of the general policy of encouraging settlements. *Cannons Engineering,* 899 F.2d at 84.

■ The underlying policy of encouraging settlements has particular force where government actors committed to the protection of public interest have worked on the construction of the proposed settlement. *Cannons Engineering,* 899 F.2d at 84. *See also In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 118 (2nd Cir.1992) ("Appellate courts ordinarily defer to the agency's expertise and the voluntary agreement of the parties in proposing the settlement."). The Government's technical and legal assessments underlying environmental settlements are entitled to deference by the courts so long as the agency charged with primary responsibility for enforcing the environmental laws "supplies a plausible explanation ... welding

some reasonable linkage" to the relevant factors. *Cannons Engineering,* 899 F.2d at 87. Generally, settlements are to be encouraged to avoid spending resources on litigation rather than cleanup. *In re Cuyahoga,* 980 F.2d at 119 (citation omitted); *Cannons Engineering,* 899 F.2d 79.

### Discussion

■ We find the United States' Settlement Agreement to be both fair and reasonable, as well as faithful to the objectives of the governing state and federal environmental statutes. The resolution of the appropriate settlement amount was based upon an estimated range of potential clean up costs of between $20 million and $100 million dollars. The basis for the at least $13.5 million settlement with the ECI family of actors (the ECI Estate, the Member–Owners, the Trustee and the Special Master) was that ECI owned and operated the Facility from 1976 through 1989, while ARCO and its corporate predecessor owned and operated the Facility from 1917 through 1976. Accordingly, in light of the fact that ARCO owned and operated the Facility for 59 years out of the 64 years of the Facility's operation, we agree with the United States that the $13.5 million dollar settlement with the ECI family of actors is reasonable.

Although $13.5 million may not be sufficient to achieve full cleanup of the Facility, the United States and the State of Indiana can still look to ARCO, and any other potentially responsible parties, for any additional reimbursement or work. Likewise, ECI retains its right to pursue a claim for contribution against ARCO while maintaining the benefit of the resolution of its liability to the United States government and Indiana.

### 1. ARCO's Objections

■ ARCO, the main objector to the United States' Settlement Agreement, does not dispute the need to settle with the government. Nor does ARCO dispute that $13.5 million dollars is a fair settlement amount

---

6. Although the United States' Settlement Agreement also requires approval under the Bankruptcy Code, the appropriateness of the agreement under the bankruptcy laws is addressed by the Trustee in a separate motion for approval.

with respect to the ECI family of actors' liability. ARCO, however, takes issue with certain terms under the agreement and therefore objects to its approval.

At the center of ARCO's dissatisfaction with the United States' Settlement Agreement is the agreement's failure to sub-allocate liability among the ECI family of actors. Specifically, ARCO claims that the Trustee should have, but failed to, scrutinize certain [7] critical time periods during the Facility's operations to determine the specific liability among each of the ECI family of actors. According to ARCO, the government, along with the Trustee, have failed to sufficiently consider the degree of involvement in disposal activities of all potentially responsible parties, the degree of care that they exercised, the cooperation and response action and the toxicity and volume of waste that they had a hand in deposing. Transcript of June 29, 1994 Proceedings at 23.

We are not persuaded that such an analysis is necessary or prudent at this juncture. As the United States properly points out, "there is absolutely no reason, as ARCO seeks, to hold the United States' Settlement Agreement hostage to the intra-ECI family liability issues." United States Response to Objections to Entry of Proposed Settlement Agreement at 11. We agree. As the First Circuit recently observed, requiring such precision as to the total extent of the harm caused and the role of each potentially responsible party is unwarranted:

> [I]t would disserve a principal end of the statute—achievement of prompt settlement and concomitant head start on response activities—to leave matters in limbo until more precise information was amassed. As long as the data the EPA uses to apportion liability for purposes of a consent decree falls along the broad spectrum of plausible approximation, judicial intrusion is unwarranted.

*Cannons Engineering,* 899 F.2d at 87–88. We find no conceivable reason why we should require the environmental settlement agreement to delineate suballocation among the ECI family of actors.

We likewise reject ARCO's contention that the United States' Settlement Agreement should be rejected because the terms are not fair and reasonable to ARCO, the only non-settling potentially responsible party. At the center of ARCO's concern are issues regarding contribution and the potential liability of the Member–Owners and CF Industries as "operators" of the Facility. Specifically, in its opposition brief ARCO objects to granting the Member–Owners and CF Industries covenants not to sue arguing, inter alia, that the United States failed to perform a sufficient factual investigation to evaluate the respective liabilities of the Member–Owners and CF Industries as operators. However, even assuming that the Member–Owners or CF Industries were to be found liable to the United States under environmental laws, the ECI Estate would be potentially liable for any recovery. As the United States points out in its Response to Objections, if found liable the Member–Owners and CF Industries would naturally assert claims for contribution against ECI based on their applicable contractual arrangements or based upon a principal/agent or corporation/shareholder relationship. Thus, even assuming that the United States could secure recovery from the Member–Owners and CF Industries, such a recovery would not alter ARCO's liability. Rather, the ECI Estate would be potentially liable for any amounts that the Member–Owners or CF Industries paid to the government.

The liability of ARCO, the only remaining potentially responsible party is yet to be determined. Under the terms of the United States' Settlement Agreement the government can look to ARCO to recover any addi-

---

**7.** At the June 29, 1994 hearing ARCO asserted that there are *four* critical time periods in the ECI life span which must be analyzed before a settlement can be approved:

(1) 1976–1980: the period of time when CF Industries managed the Facility;

(2) 1980–1981: the year after CF Industries terminated its agreement and before the debtor-in-possession period;

(3) 1981–1984: the debtor-in-possession period while the estate was in Chapter 11 bankruptcy; and

(4) 1984–present: the period during the Trustee's watch under Chapter 7.

tional costs of remediating the Facility. Likewise, the ECI family of actors can turn to ARCO to attempt to recover whatever excess they paid in the settlement. Understandably, ARCO is not pleased with either one of these arrangements. As ARCO sees it we are only postponing the inevitable if we refuse to address the parameters of ARCO's liability here and now. According to ARCO in light of the fact that the United States has reserved rights against ARCO, litigation will not be avoided by virtue of the settlement. However, even though under the United States' agreement some litigation may follow, the $13.5 settlement may, at the very least, set the ball in motion and allow the clean up of the Facility to proceed.

The $13.5 million settlement amount is premised on a plausible allocation of liability between the ECI family of actors and ARCO based on their respective years of ownership or operation. We find that this is a fair and reasonable basis for calculating the ECI family and ARCO's respective liabilities. We further find no merit to any of the objections which ARCO has raised either in its briefs or during oral argument. ARCO has failed to come forward with a persuasive reason as to why we should hold the United States' Settlement Agreement hostage to a determination of sub-allocation among the ECI family of actors or a determination of ARCO's own liability. Accordingly, finding that the United States' Agreement is "fair, reasonable and faithful to the governing statutes," *Cannons Engineering*, 899 F.2d at 84, the agreement is approved over ARCO's objections.

### 2. *East Chicago's Objections*

■ The City of East Chicago ("the City") has also filed an objection to the entry of the United States' Settlement Agreement. Although the City generally agrees with the terms of the settlement agreement, it objects

to its entry because it fails to provide the City with an opportunity to become a party for the purpose of obtaining access to certain documents and for the purpose of obtaining a covenant not to sue. Essentially, the City is asking us to force the United States to include the City as a party to the settlement agreement. While we recognize the City's concerns regarding its potential liability involving the Facility, we do not agree its exclusion from the settlement agreement will either result in fundamental unfairness or will put the underlying purposes and goals of the relevant environmental statutes at risk.

The City does not object to the underlying merits of the United States' Settlement Agreement. Moreover, the City has failed to demonstrate how the terms of the proposed agreement will detrimentally alter its rights and liabilities. Accordingly, we decline to hold the United States' deal with other potentially responsible parties hostage to the City's demand that it be included as a party to the agreement.[8]

### II. The Trustee's Motions for approval of both settlement agreements under the Bankruptcy Code

In a consolidated motion, the Trustee moves for approval of both the United States' Settlement Agreement and the Member–Owner Settlement Agreement under the Bankruptcy Code.

As indicated above, the United States' Settlement Agreement seeks to resolve environmental claims asserted by the United States and the State of Indiana against the ECI family of actors.[9] Under the terms of the United States' Agreement the Estate agrees to pay a total of $13.5 million dollars to the ECI Facility Trust Fund, along with a percentage of net insurance proceeds. In return, both the United States' and the State of Indiana's proofs of claim against the Estate

---

**8.** To the extent that the City asks for certain rights with respect to notice issues and access to certain documents, the City has not properly noticed up the matter.

Likewise, the City's request for findings of fact that it is not liable by reason of its ownership and activities in relation to the Facility is also not properly before us. However, we note that it seems as though, as suggested by the United

States, the City's request is precluded as it is a request for pre-enforcement judicial review in contravention of CERCLA's requirements regarding the timing of review. *See* 42 U.S.C. § 9613(h).

**9.** Other relevant provisions of the United States' Settlement Agreement are set forth above and do not bear repeating.

will be deemed settled, satisfied and paid. The Estate will be entitled to protection from existing or future claims for contribution for matters addressed in the United States' Agreement. Finally, the Estate retains all rights available to it to seek indemnification or contribution from other parties for the amounts paid pursuant to the United States' Agreement.

The Member–Owner Settlement Agreement, on the other hand, purports to resolve all environmental disputes among the Member–Owners, CF Industries and the ECI Estate and provides for contribution toward the amounts to be paid under the United States' Settlement Agreement. Under the terms of the Member–Owner Settlement Agreement, the Member–Owners agree to convey to the Estate (i) 20% of the amounts distributed to the Member–Owners pursuant to Section 1(b)(i) of the November 4, 1987 ARCO Settlement Agreement ("the ARCO Settlement Agreement"), such amount not to exceed $200,000; and (ii) 30% of any amounts distributed to the Member–Owners pursuant to Section 1(b)(iii) of the ARCO Settlement Agreement, not to exceed $250,000. In addition, the Member–Owners will release their proofs of claim against the Estate and each claim will be deemed settled, satisfied and paid. With respect to CF Industries, under the terms of the Member–Owner agreement CF Industries agrees to release its general unsecured $319,000 claim against the Estate and agrees to pay the Estate $600,000. In return for the consideration received from the Member–Owners and CF Industries, the Estate agrees to release and covenants not to sue the Member–Owners and CF Industries.

Before addressing the substantive issues raised by the Trustee's motion, along with ARCO's objections, we first examine the appropriate standard of review which will guide our decision.

### Standard of Review

■ The Seventh Circuit in *Matter of Energy Co-op., Inc.,* 886 F.2d 921 (7th Cir.1989), set forth the standard for the approval of a bankruptcy settlement agreement, stating that the "benchmark for determining the propriety" of such an agreement is "whether the settlement is in the best interest of the estate." *Id.* at 927. In making such a determination, the terms of the settlement must be compared with the litigation's probable costs and benefits:

> [T]he job of the reviewing court is to determine whether the value of the proposed compromise distribution is *reasonably* equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved.... The test for reasonable equivalence is whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities.... A challenged settlement fails this test only if it falls below the lowest point in the range of reasonableness.

*Id.* at 929 (citations and internal quotation marks omitted) (emphasis in original). Essentially, the relevant inquiry is whether the proposed settlement agreements fall "within the reasonable range of litigation possibilities." *Id.*

### Discussion

■ In support of its motion to approve both settlement agreements, the Trustee asserts that both agreements are in the best interest of the Estate. According to the Trustee, the Estate's right to seek contribution from the Member–Owners and CF Industries is uncertain and litigation over this issue could be costly, with a significant risk of no recovery at all. In light of this risk/reward analysis, the Trustee asserts that the amount the Estate will pay in settlement of the environmental claims falls within the reasonable range of litigation possibilities that could result if the environmental claims were litigated.

ARCO objects to the entry of both settlement agreements on a number of grounds. Basically, ARCO claims that the agreements are not in the best interest of the Estate because the Trustee has failed to make a reasonable investigation and analysis of the claims being settled. Specifically, ARCO claims that the Trustee has underestimated the value of the Estate's environmental claims against the Member–Owners and CF Industries and has failed to even take the

minimum steps routinely required to properly allocate liability among all potentially responsible parties. Echoing its objections to approval of the United States' Agreement under environmental laws, ARCO protests that the Trustee did not consider its chances of recovery from the Member–Owners under both federal and state environmental laws in structuring the settlement agreements.

We find no deficiency in either the Trustee's investigation or evaluation of the claims subject to the settlement agreements. It is evident that in reaching both settlement agreements the Trustee exercised appropriate judgment in considering the best interest of the Estate in light of the range of litigation possibilities.

First of all, the method of allocating liability based on ECI's and ARCO's respective years of ownership and operation is both fair and reasonable. ARCO ran the Facility for 90% of its operating life, during which time hazardous substances were deposited on the site. That the Estate may have a right to contribution from ARCO is neither inconceivable nor inequitable to ARCO. The Estate faces significant risks of liability to both the United States government and the State of Indiana. Thus, it is understandable that the Trustee would want to achieve a final and complete settlement with the governmental entities now, and pursue ARCO later if it is determined that the Estate paid more than its fair share for damage done to the Facility during the ECI years. Moreover, as mentioned above, even assuming that the United States or the State of Indiana would be able to successfully secure a recovery against the Member–Owners or CF Industries, the ECI Estate would be potentially liable for any amounts that the Member–Owners or CF Industries paid. Accordingly, we are hard pressed to find how the Trustee has "short changed" the Estate and its creditors.

ARCO claims that the Trustee has failed to perform an adequate investigation and analysis of the environmental claims addressed by the proposed settlements. On the contrary, we find that the Trustee's involvement in and evaluation of this case has been more than sufficient. As evidence by the Trustee's submissions, over the past 10 years the Trustee has accumulated and assimilated an abundance of data relating to the damage to the Facility and the parties' respective involvement. For instance, early on the Trustee retained a special environmental consultant to analyze the extent of the environmental problems at the Facility, had several conversations and office meetings with the Special Master, and regularly visited the Facility. *See, e.g.* June 14, 1994 Affidavit of Jay A. Steinberg at ¶¶ 24, 30, 34, and 73. Additionally, the Trustee has reviewed numerous documents, including relevant EPA records and certain ARCO business records. *Id.* at ¶¶ 92, 94. It is evident that the Trustee is well versed in the history of the Facility, including ARCO's actions during its tenure as owner and operator.

Furthermore, the Trustee has evidenced a solid comprehension of the Estate's possible recovery against each potentially responsible party. With the aid of legal counsel, the Trustee has evaluated: (1) ECI's potential exposure to the relevant government agencies for cleanup costs at the Facility; (2) ECI's claim for contribution against ARCO; (3) ECI's contribution claims against the Member–Owners and CF Industries; and (4) potential claims against the Special Master. *Id.* at ¶¶ 69–72. In reliance upon his own investigation and the advice of counsel, the Trustee concluded that any potential claims that the Estate may have against the Member–Owners were weak, while any potential claims against CF Industries were negligible. *Id.* at ¶¶ 77, 83. By contrast, the Trustee determined in reviewing ARCO's business records and in considering the comparative lengths of ownership and operation of the Facility that ECI has a strong contribution claim against ARCO. *Id.* ¶¶ 85–86.

In sum, we find that the Trustee's investigation and analysis of the claims being settled was reasonably sufficient for the purposes of entering a valid settlement agreement. ARCO is seemingly suggesting that this case cannot be settled unless and until the parties have completed full discovery and have essentially prepared this case for trial. Imposing such a requirement, however, would undermine the main purpose of encouraging settlements. We are not persuad-

ed that a more detailed investigation into respective activities at the site is necessary, or that such an investigation would even favor ARCO. The data accumulated by the Trustee, along with his evaluation of such data, provides a more than sufficient basis upon which we can make a finding that the proposed settlement agreements are in the best interest of the Estate.

### III. Motion for Authority to Make an Interim Distribution to General Unsecured Creditors

■ The final motion before us is the Trustee's motion for approval of an interim distribution in the amount of 20%. The Trustee seeks approval of an interim distribution to general unsecured creditors of $.20 for each dollar of allowed claims. The distribution would be made to the approximately $62,029,724.85 claims remaining against the Estate. The Trustee's request for interim distribution is conditioned upon entry of a final, non-appealable order approving both settlement agreements. Funds that remain in the Estate after the settlement and distribution will be used to pay administrative expenses incurred in the Trustee's efforts to apportion the environmental liabilities paid as a result of the settlement agreements.

The Member–Owners and certain pre-petition lenders ("the Banks") have filed their own motion seeking an interim distribution.[10] The Member–Owners/Banks agree that if we approve both settlement agreements a distribution from funds available in the ECI estate should be made. However, the Member–Owners/Banks jointly move for a 25% distribution, as opposed to the 20% distribution suggested by the Trustee. In support, the Member–Owners/Banks argue that they are entitled to a 25% distribution under a 1988 Settlement Agreement which provides that the Trustee is authorized to make a distribution to the Member–Owners and Banks under two circumstances. First, under paragraph 6(a) of the 1988 agreement the Trustee may release the escrowed funds if the Court determines that the Estate has sufficient funds to make a 25% distribution and pay all

known and reasonably anticipated administrative expenses and priority claims. Second, the 1988 agreement provides that payment is required if the Court finds that the Trustee has sufficient funds that a 25% distribution will be possible. According to the Member–Owners/Banks, since the Trustee is not purporting to make a 25% distribution at this time, the only issue for us to consider is whether the Estate has sufficient funds for a 25% distribution at this time.

We agree with the Trustee's position that a 20% distribution is appropriate at this time. As discussed above, the Trustee has performed a diligent, extensive analysis concerning the best interests of the Estate and the respective claims at issue. A 25% distribution, as suggested by the Member–Owners/Banks, would be too ambitious at this juncture, particularly in light of voiced concerns regarding the possibility of future administrative and litigation costs.

### CONCLUSION

In sum, as stated above, we agree that the United States' Settlement agreement falls within the range of reasonable litigation possibilities and therefore warrants our approval. Likewise, both the Member–Owner Settlement Agreement and United States' Settlement Agreement are hereby approved as they have been shown to be in the best interest of the Estate. We add that we have carefully reviewed each of the objecting parties contentions, and those not specifically referred to above are rejected; while we are aware of the objecting parties' concerns, none of the objections raised are sufficient to ward of entry of the proposed settlement agreements or deserving of additional comment. The creditors have waited a long time for some return on their claims. It is time, and legally appropriate, to reward their patience.

Accordingly, for the foregoing reasons, this Court grants its approval of both the United States' Settlement Agreement and the Member–Owner Settlement Agreement. In addition, the Trustee's motion for an interim

---

10. *See* Joint Motion to Authorize and Direct Trustee to Release Monies and Claims under

Settlement Agreement Dated January 22, 1988 ("Member–Owners/Banks' Joint Motion").

distribution of 20% to general unsecured creditors is granted.