**In the Matter of RIMSAT, LTD., Debtor.**

**Bankruptcy No. 95–10120.**

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 11, 1997.

---

James T. Young, Fort Wayne, IN, for Trustee.

William Factor, Chicago, IL, for Kauthar Sdn. Bhd.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

This case began with an involuntary petition for relief under Chapter 11 of the United States Bankruptcy Code. A trustee was appointed and relief was granted under Chapter 11. Thereafter, Paul Underwood was elected to serve as the Chapter 11 trustee and he did so until April 22, 1997, when the case was converted to Chapter 7. Following conversion, Elliott Levin became the duly appointed and qualified trustee.

During the course of these proceedings, the Friendly Islands Satellite Communications Company, Ltd. (Tongasat) filed a proof of claim seeking in excess of $2,400,000. The claim is based upon a contract between the debtor and Tongasat, under which Rimsat leased geostationary orbital slots for communications satellites serving the Pacific Rim. The prior trustee objected to this claim, contending Rimsat was entitled to set-offs against the amounts due as a result of various claims it had against Tongasat. Tongasat subsequently filed an adversary proceeding seeking a declaratory judgment that the contract with Rimsat had been validly terminated prior to the date of the petition. The prior trustee answered and filed a counterclaim, reasserting and seeking damages for the same claims which were asserted in opposition to Tongasat's proof of claim, as well as a new claim seeking damages due to Tongasat's alleged violation of the automatic stay. Thereafter, another adversary proceeding was filed by the prior trustee, seeking the recovery of approximately $425,000 in allegedly preferential transfers made during the ninety days prior to the petition.

As of the date the case was converted to Chapter 7, Tongasat and the Chapter 11 trustee were on the verge of reaching a settlement of the issues raised by Tongasat's claim, the objections to it, and the two adversary proceedings. Under the settlement, Tongasat would withdraw its proof of claim, with prejudice, and pay the estate $500,000. In return, each party would release the other from all claims they might have against the other, exchanging mutual general releases.

Following his appointment as Chapter 7 trustee, Mr. Levin undertook an investigation to educate himself concerning the bankruptcy case and the dispute between the estate and Tongasat. He consulted with counsel for the various parties, principals of the debtor, counsel for Tongasat, and the prior trustee. He retained as his own counsel Mark Warsco, the same attorney who had served as counsel to the Chapter 11 trustee. Mr. Levin reviewed depositions that had been taken throughout the course of the Chapter 11 case, as well as the documents and other information generated through discovery conducted in connection with the litigation with Tongasat. Having done so, Mr. Levin came to the conclusion that the proposed settlement was the best offer that could be obtained from Tongasat and that to accept it would be in the best interest of creditors and the bankruptcy estate. Accordingly, he decided to do so and, on June 19, 1997, filed a motion to approve the compromise. Only one party, Kauthar Sdn. Bhd.,[1] filed an objection. The matter is be-

---

1. Until the day of trial, Kauthar had been participating in the bankruptcy case as an equity security holder of the debtor. That morning, however, it filed a proof of claim seeking more than $115,000,000 as an unsecured claim, based upon unexplained violations of various state and federal securities laws, RICO, and unspecified allegations of fraud and misrepresentation, to name but a few. Although the claim is timely in rela-

tionship to the claims bar date established as a result of the conversion to Chapter 7, the court finds it curious that it was not until after the Chapter 7 trustee challenged Kauthar's standing, as an equity security holder, to object to the compromise, that Kauthar first suggested that it might hold a claim against the estate, thereby making it a creditor. By filing the proof of

688

fore the court following the trial of the issues raised by the motion to compromise and Kauthar's objection to it.

■ Whether or not a proposed settlement is approved is a matter committed to the bankruptcy court's discretion. *Matter of Andreuccetti,* 975 F.2d 413, 421 (7th Cir. 1992); *In re American Reserve Corp.,* 841 F.2d 159, 162 (7th Cir.1987). As observed by the Seventh Circuit, this requires the court to actually exercise its discretion. We are not permitted to just accept the representation that the settlement is fair and reasonable. Instead, the court must familiarize itself with all of the attendant facts and circumstances, in order to "make an 'informed and independent judgment' about the settlement." *American Reserve Corp.,* 841 F.2d at 162 (citation omitted). Among the factors which the court considers in its evaluation are the nature and complexity of the dispute and its probable outcome, together with the expense, inconvenience and delays necessarily attendant to litigation. Objections to the settlement must also be considered, although the views of objecting creditors are not controlling. *Id.* at 161–62.

■ While the court must make an informed and independent judgment concerning the propriety of the proposed settlement, it need not make an independent investigation of the facts and it may give weight to the trustee's informed judgment and consider the competency and experience of counsel who support the compromise. *Depoister v. Mary M. Holloway Foundation,* 36 F.3d 582, 587 (7th Cir.1994); *In re International Distribution Centers, Inc.,* 103 B.R. 420, 422–23 (S.D.N.Y.1989); *In re Drexel Burnham Lambert Group., Inc.,* 134 B.R. 493, 496 (Bankr.S.D.N.Y.1991); *In re Del Grosso,* 106 B.R. 165, 168 (Bankr.N.D.Ill.1989). The court also need not conduct a mini-trial on the merits of the case. *International Distribution,* 103 B.R. at 423; *Drexel Burnham,* 134 B.R. at 496–97. *See also, Depoister,* 36 F.3d at 586 (evidentiary hearing not required).

[T]he bankruptcy court's responsibility is not to decide the numerous questions of

claim, Kauthar has rendered the standing objec-

law and fact raised by parties, but rather to canvas the issues in order to determine whether the settlement "falls below the lowest point in the range of reasonableness." *In re Goldstein,* 131 B.R. 367, 370 (Bankr.S.D.Ohio 1991) (citations omitted). *See also, In re Lawrence & Erausquin, Inc.,* 124 B.R. 37, 38 (Bankr.N.D.Ohio 1990) (what is being sought is not resolution of issues but their identification and clarification).

■ "The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *Matter of Energy Co-op., Inc.,* 886 F.2d 921, 927 (7th Cir.1989). As the proponent of the settlement, the trustee has the burden of proving that it is. *In re Bell & Beckwith,* 93 B.R. 569, 574 (Bankr. N.D.Ohio 1988). The central inquiry in the determination involves "a comparison of the settlement's terms with the litigation's probable costs and probable benefits." *American Reserve Corp.,* 841 F.2d at 161. The court must examine the terms of the proposed settlement, in light of the risks and rewards of not settling, and determine whether the proverbial bird in the hand is worth two in the bush. While this is not and cannot be the subject of a rigid, mathematical analysis, there must, nonetheless, be some type of correspondence between what is being given in connection with the compromise and what might be received if the dispute was prosecuted to its ultimate conclusion. Thus, the consideration being given in connection with the settlement must be "reasonably equivalent" to the value of the disputed claim, by "fall[ing] within the reasonable range of litigation possibilities." *Energy Co-op.,* 886 F.2d at 929 (quoting *Matter of New York, N.H. & H.R. Co.,* 632 F.2d 955 (2d Cir.1980)); *Matter of Krizmanich,* 139 B.R. 456, 460 (Bankr.N.D.Ind.1992).

### The Estate's Claimed Set–Offs Against Tongasat's Claim

As of the date of the petition there was a dispute over the amounts due Tongasat from the debtor. Tongasat has filed a proof of claim seeking $2,429,000. Rimsat's own rec-

tion moot.

ords, however, show it only owed Tongasat $2,172,000 as of the date of the petition. This is the amount the debtor used to schedule Tongasat's claim, which, given the controversy, was listed as disputed. *See* Ex. 12, Debtor's Schedule F. Consequently, the court can comfortably begin its analysis of the proposed settlement based upon the proposition that Tongasat is owed at least $2,172,000, and possibly more.

The disparity between the amount claimed by Tongasat and the amount shown on Rimsat's records is the basis for one of the objections to Tongasat's proof of claim. The original objection contends that, in asserting its $2,429,000 claim, Tongasat had failed to give Rimsat credit for $400,000 in payments which had been made but not credited toward the balance due. The court notes that the discrepancy between Rimsat's records and Tongasat's records is not $400,000, as originally alleged, but only $257,000. Coincidently, approximately $255,000 of Tongasat's total claim consists of interest and penalties. The principle balance claimed due ($2,173,000) corresponds closely with the debtor's own records ($2,172,000). Consequently, not only is any dispute over payments and credits much smaller than originally suggested ($257,000 v. $400,000), but it may be almost non-existent.

In addition to the potentially ready explanation for the discrepancy in the parties' records, the trustee also reports that he has not been able to identify any payments which Rimsat's records reflect have been made but not credited by Tongasat in calculating the balance due it. In view of this state of affairs, the trustee has concerns about his ability to prove the defense of payment.

Kauthar contends that the trustee should work harder and dig deeper to find the missing payments, arguing that the trustee's inability to find them is proof of the inadequacy of his investigation.[2] While the trustee acknowledges that he did not begin the investigation anew or ask Rimsat's controller which payments she believes were not credited, the court does not believe the trustee was required to do so. Mr. Levin did not need to reinvent the wheel. Instead, he could legitimately rely and build upon the work of his Chapter 11 predecessor and his attorney. Mr. Levin needed only to satisfy himself that the question had been sufficiently investigated; he did not need to duplicate the previous investigation. The court concludes that the trustee has legitimate reasons to be concerned about the estate's ability to succeed on this defense to Tongasat's claim.

"Tongasat's fraud or Rimsat's naiveté?" This is the question presented by yet another defense the estate has raised against Tongasat's claim in this proceeding. The gist of the objection is that Matt Nilson, then Tongasat's managing director, had represented that the orbital slots in question were "fully registered." This representation, together with a contract provision which states that "Tongasat has registered [certain] GOS positions and bands with the IFRP",[3] Ex. 1, ¶ 4.1, supposedly led Rimsat to believe that these positions could be used without restriction or interference from surrounding satellites. *See* Ex. 3, ¶ 2(a), p. 2. This proved not to be the case. As a result, the objection contends the estate is entitled to a refund of the $800,000 it paid to exercise its option for the slots located at 70E and 170.75E, in addition to the monthly licensing fees.

After his investigation, the trustee has doubts about his ability to prove this contention. In addition to the standard concerns where any type of fraud or misrepresentation is alleged, the trustee points to the fact that the contract addresses the possibility that there may be coordination problems with neighboring satellites. *See e.g.*, Ex. 1, ¶ 4.4, ¶ 18.13 & Feb. 22, 1993 amendment, ¶ 5.1.6. This would indicate that Rimsat's use of these slots was not to be as unrestricted as the objection initially suggests. Since Tongasat undisputedly had the rights to the slots in question and Rimsat was able to occupy

---

**2.** The argument strikes the court as the same one that is often advanced by conspiracy theorists, who, when confronted with the lack of evidence to support their claims, use the rejoinder that the lack of evidence does not demonstrate a flaw in their thinking, but rather, proves how deeply the conspiracy runs.

**3.** The IFRB is the International Frequency Registration Board.

them, the trustee doubts his ability to prove fraud, misrepresentation, or even a breach of Tongasat's obligations under the contract.

Kauthar takes exception to the way in which the trustee has evaluated this claim. It contends that the trustee's investigation was inadequate, in part, because neither Mr. Levin nor his counsel Mr. Warsco are space law experts. In its view, unless the trustee retained such an expert, it could not properly evaluate the claim. The argument is based upon a statement from *In re Del Grosso*, 106 B.R. 165, 168 (Bankr.N.D.Ill.1989), that in order to obtain approval of a proposed compromise, one of the things the trustee must show is "that the proponents have counsel experienced in similar cases. . . ." Since neither Mr. Levin nor Mr. Warsco claim any particular experience or expertise with regard to space law or satellite litigation, *a fortiori*, Kauthar insists the compromise must fail.

The court is unwilling to read *Del Grosso* so literally. The Seventh Circuit has certainly not made this a specific requirement of a motion to compromise. We think the statement requires nothing more than that, where appropriate, the trustee obtain competent and intelligent advice with regard to the matter at hand. Furthermore, the court is not persuaded that the dispute in question necessarily requires any particular expertise in space or satellite law, as opposed to more traditional issues. The court is of the opinion that both Mr. Levin and Mr. Warsco are sufficiently capable and experienced in order to competently and adequately represent and advise the estate with regard to the issues at hand. Even if consulting an expert was a requirement for the trustee's evaluation of the settlement, the evidence before the court indicates that the trustee had access to and considered such an opinion, which the debtor obtained in the latter part of 1994. (*See*, Ex. 37, Reports prepared by Jorn Christensen, dated Nov. 2, 1994 and Dec. 19, 1994.) In the court's opinion, those reports support the trustee's decision to compromise, rather than litigate, the issue in question.

The court must express some skepticism as to whether Mr. Nilson's alleged represen-

tation regarding registration and Rimsat's "unfettered and unencumbered"[4] ability to use the slots is the type of representation which could form the basis of a fraud claim or merely a seller's puffery with regard to the quality of its product. *See e.g., Searls v. Glasser*, 64 F.3d 1061 (7th Cir.1995) (statements describing company as "recession resistant" lacked the requisite specificity to be considered anything but optimistic rhetoric); *Continental Bank N.A. v. Meyer*, 10 F.3d 1293 (7th Cir.1993) (statements that partnership for breeding thoroughbred horses was a "risk-free" investment and horses would be of "highest quality" were no more than expressions of opinion or seller's puffing); *Royal Business Machines v. Lorraine Corp.*, 633 F.2d 34 (7th Cir.1980) (representations by seller concerning quality of copying machines and infrequent need for repair were not affirmations of fact, but mere sales talk and expressions of opinion); *Whitson v. Aurora Iron & Metal Co.*, 297 F.2d 106, 109 (7th Cir.1961) (seller's statements concerning the quality and capabilities of scrap metal baler, made prior to execution and not incorporated within the written contract, were not fraudulent misrepresentation, but "puffing" sales talk). Whichever it was, the court has further doubts concerning the reasonableness of Rimsat's reliance upon it, absent any type of investigation or inquiry. *See AMPAT/Midwest Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1041 (7th Cir.1990) ("the victim of fraud [must] prove justifiable, or in other words reasonable, reliance, implying *some* duty of care on the part of the victim") (emphasis original). Had Rimsat done so, it would have discovered that the slots were not registered with the IFRB, at least not in the manner Rimsat contends it was led to believe. This fact would have been a matter of public record. Furthermore, only a basic knowledge of the satellite industry was needed in order to recognize that the statement contained at paragraph 4.1 of the contract, *see* Ex. 1, concerning Tongasat having registered "GOS positions and bands", is not a correct usage of the terms. *See* Ex. 37, Nov. 2, 1994 Report at 1. It is assigned frequencies, not the frequency bands themselves,

---

4. Kauthar's words.

which are registered, and the distinction is significant. *Id.* at 2. At the very least, there appears to be some ambiguity with regard to the nature of Tongasat's representations about these geostationary orbital slots. Was it representing that it had the right to allow Rimsat to use the slots in question (which it did) or was it representing something with regard to the quality of that use?

The parties' original contract indicates that some changes as a result of the coordination process might be necessary and that the use of the positions was subject to IFRB regulations. *See, e.g.,* Ex. 1, ¶ 4.4 & ¶ 18.13. The purpose of the coordination process is to minimize or eliminate satellites' interference with one another. Since the contract specifically provides that Rimsat's use was subject to IFRB regulations and refers to a process designed to address and minimize interference problems, it is doubtful that Tongasat was representing that Rimsat's use of the positions would be without restriction or interference from surrounding satellites. Why refer to a process that is designed to address interference problems if you are representing that there will be no such problems?

In retrospect, the coordination process proved to be far more difficult than originally anticipated. Subsequent amendments to the contract addressed the issue more specifically, requiring Rimsat to advance the expenses reasonably necessary to effect coordination, *see* Ex. 1, Feb. 22, 1993 amendment, ¶ 19. 1, and providing for payment reductions due to interference, *id.* at 5.1.6. Furthermore, interference and coordination problems were not necessarily due to anything that Tongasat, the owner of the orbital slots, was doing. Instead, they were caused by the operations of neighboring satellites, whose administrators chose to be less than neighborly in trying to minimize their interference with Rimsat's satellites. As a result, it does not seem that Tongasat should be held accountable for the actions of third parties which it could not control. To the extent the contract may

have required Tongasat to initiate the coordination process, it appears that Tongasat fulfilled this obligation.

The court cannot overlook the fact that the parties were embarking upon a complex commercial transaction, involving hundreds of thousands, if not millions, of dollars, in a new and emerging field—the commercialization of space. If Rimsat wanted or needed a warranty with regard to its ability to use the positions "without restrictions due to interference of surrounding satellites", *see* Ex. 3, ¶ 2(a), p. 2, one would have expected Rimsat to have bargained for and incorporated such a commitment in the agreement; rather than simply assuming it would be able to do so and, when this proved not to be the case, then cry fraud. Although the contract contains some representations, warranties, and covenants, *see* Ex. 1, ¶ 12, Tongasat made no warranty or covenant with regard to Rimsat's ability to use the slots without restriction or interference. At best, Tongasat merely covenanted to maintain its authorization to use the positions and bands and to take the action necessary to maintain and defend that operating authority. *See* Ex. 1, ¶ 12.7.1. This obligation is very different from the one the trustee's claim objection would attempt to impose upon Tongasat. The trustee's concern that he may not be able to successfully do so is well founded.

A second variation on the prior theme of "Tongasat's misrepresentation or Rimsat's naiveté?" is the estate's claim concerning a used Gorizont satellite that Rimsat leased from the Russians and placed in orbit at slot 134E, upon the urging of Matt Nilson. Once in place, Rimsat discovered that the satellite did not work as well as expected. In its claim objection, the trustee contends that Nilson knew of the satellite's deficiencies and had ulterior motives for wanting to place a satellite at that location as quickly as possible.[5] Consequently, it seeks to recover from Tongasat the claimed losses resulting from this transaction with a third party.[6]

---

**5.** Whatever may be said of Tongasat's motivation, there are also indications that Rimsat had its own independent reasons for wanting to quickly occupy the position. *See* Ex. 43, p. 4;

Ex. 42, ¶ 1. *See also* Ex. 1, ¶ 4.4 & Feb. 22, 1993 amendment, ¶ 4.4.

**6.** The court notes that the contract between Rimsat and Tongasat seems to have been amended

Normally, if one wants a commitment that a product will be of a certain quality or will perform in accordance with certain expectations, one seeks a warranty from the seller. No such warranty with respect to the used satellite was obtained, either from the Russians, who leased the satellite, or from Tongasat, who recommended the transaction. As is often the case with used cars, the used satellite did not live up to Rimsat's expectations. It only had enough power to operate four of its six transponders and, once in place, Rimsat could use only one of the four because of interference from a neighboring satellite. Whether this state of affairs was due to the quality of the satellite or the way in which Rimsat used it seems to be debatable. Nonetheless, in the absence of any kind of warranty, the claim objection essentially seeks to impose such an obligation (either expressly or as an implied warranty of fitness for a particular purpose) upon Tongasat under the guise of fraud.

The trustee's concern that he will have difficulty persuading the court to place the financial responsibility for this state of affairs upon Tongasat is justified. It seems quite likely that Rimsat got exactly what it bargained for: a used satellite which enabled it to quickly get some type of operation up and running.

Two other challenges to Tongasat's proof of claim relate to slot 138E, an orbital position on which Rimsat had an option, and the placement of a satellite in that position by APT, an entity owned by China. APT had placed a satellite in a neighboring position which dramatically interfered with one of Rimsat's operational satellites, rendering it almost unusable. It appears that APT and

the Chinese government initially resisted voluntary coordination which would have minimized or eliminated the interference between Rimsat's satellite and APT's satellite. Eventually, an accommodation was reached as a result of negotiations in which Rimsat's Chief Operating Officer, Mr. Sternberg, participated on behalf of Rimsat. The solution was that APT would be allowed to place its satellite at 138E, which it would lease from Tongasat; Rimsat would give up its rights to that position and its rights under the "most favored nation" clause of the contract[7] with regard to the APT transaction. Although Rimsat would like to say that it never agreed to such a resolution of the problem, Rimsat's Managing Director, Mr. Simon, eventually acknowledged at trial that he "strongly implied" such a solution would be acceptable, if Rimsat received some type of consideration for doing so.[8] The negotiations took place during the summer of 1994, around the time Rimsat began to experience severe financial problems. The expectation of receiving some type of unspecified consideration for giving up its option on 138E never materialized and, by early 1995, Rimsat was in bankruptcy. As a result, the hoped for consideration is sought in connection with the objection to Tongasat's proof of claim.

Because Rimsat believed that the APT lease was for $400,000 a year less than Rimsat's lease payments, the claim objection seeks a credit of $400,000 for each of the two satellite slots Rimsat leased from Tongasat, as a result of the contract's "most favored nation" clause.[9] With respect to Rimsat's rights under this provision, there is a dispute over whether the APT lease was upon "sub-

---

on February 22, 1993, to address used satellites, see Ex. 1, Feb. 23, 1993 amendment, ¶ 5.3, yet imposes no obligation on Tongasat with respect to the quality of such a satellite.

7. This clause provides:
   In the event that Tongasat hereafter enters into an agreement with a third party to use a GOS position for the operation of a Cband space communications satellite, under substantially the same terms and conditions as set forth in this Agreement, but at lower rates than set forth in 5.1.4 and 5.1.5 above, then Tongasat shall offer such lower rates to Rimsat.... Ex. 1, ¶ 18.11.

8. One aspect of this objection to Tongasat's claim will involve the issue of whether Rimsat agreed to the solution or only "strongly implied" that it was acceptable.

9. Given the fact that the APT lease apparently occurred in the summer of 1994 and Tongasat's proof of claim is for the amounts due as of the date of the petition, approximately six months later, it would seem that the maximum credit to which Rimsat might be entitled under this argument would be closer to $400,000, not the $800,-000 claimed.

stantially the same terms and conditions" as the Rimsat lease and whether the clause would otherwise apply, given the frequency band upon which APT was operating. In addition, we have the fact that Rimsat arguably agreed to waive its rights under the clause with regard to this one transaction. Given the situation Rimsat found itself in and the interference caused by the APT satellite in its original location, it seems that Rimsat may have been better off waiving its rights under the "most favored nation" clause than by standing on those rights and allowing one of its satellites to become unusable.

Insofar as Rimsat may have given up its option on 138E and never received the hoped for, yet unstated, compensation, the trustee has doubts about the ability to prove any damages as a result of having done so. All Rimsat had was an option to occupy the position and it was never in a position to exercise that right. Although Kauthar tries to suggest that Rimsat's rights to the position were somehow worth $30,000,000, the legitimacy of the argument is highly doubtful. The contract with Tongasat does not allow Rimsat to assign rights to an unoccupied slot without Tongasat's consent "which consent can be withheld at its sole digression [sic]." Ex. 1, ¶ § 17.1.2. Under these circumstances, it would seem that the rights to an unoccupied slot would be worth little, if anything at all.

### Tongasat's Declaratory Judgment Action

The contract between Rimsat and Tongasat allowed Tongasat to terminate the agreement if Rimsat failed to make the required payments when due. Ex. 1, ¶ 8.2.2. Before doing so, however, it was required to issue a written notice giving Rimsat forty-five days to cure the default. Ex. 1, May 29, 1992 amendment, ¶ 8.4. Tongasat contends that it terminated the agreement prior to the date of the petition, on December 23, 1994, as a result of Rimsat's failure to cure a default in payments within forty-five days following a notice issued on November 7, 1994. Tongasat's declaratory judgment action seeks a declaration that it successfully did so. The trustee does not dispute Rimsat's default, Tongasat's notice initiating the termination process or Rimsat's failure to cure the de-

fault within the required forty-five days. Instead, the trustee argues that Tongasat waived its right to terminate the contract and/or that it is estopped from claiming termination.

By the summer of 1994, Rimsat had fallen behind in its payments to Tongasat. On July 27, 1994, Tongasat sent Rimsat notice that its rights under the agreement would be terminated if payment was not received within forty-five days. See Ex. 13; Ex. 1, May 29, 1992 amendment, ¶ 8.4. "[I]n light of additional information" provided by Rimsat, Tongasat rescinded this notice by a letter dated August 3, 1994. See Ex. 14. The parties continued to work toward an arrangement by which Rimsat would cure its default, but they were not successful in doing so. As of November 7, 1994, Rimsat was still in default. On that date, Tongasat again sent Rimsat notice of termination, giving it forty-five days to pay the arrearage or its rights under the contract would be terminated. See Ex. 17. During November and December of 1994, the parties attempted to reach an agreement to cure the default. While drafts of such an agreement were exchanged, see Exs. 22–24, no agreement was reached, and at the expiration of the required forty-five days, Rimsat still had not cured its default. By a letter dated December 23, 1994, Tongasat terminated the contract. See Ex. 25.

Although Tongasat's letter of December 23, 1994 terminated the agreement with Rimsat, it allowed Rimsat to continue its operations on a day-to-day basis at the sole discretion of Tongasat and indicated a desire to continue working together in order to correct the problems that led to the termination. Id. On January 3, 1995, Tongasat accepted Rimsat's agreement to a proposal which would allow it to restore its rights under the agreement, by making the payments which were in arrears within 21 days. See Ex. 26. This was not done and, by a letter dated January 25, 1995, Tongasat again confirmed termination of the contract. See Ex. 29.

The argument that the agreement was not validly terminated prior to the petition is based on the theory that, by rescinding its July 1994 termination notice and by giving Rimsat an additional 21 days to make the

defaulted payments and thereby restore its rights under the agreement, Tongasat somehow waived the right to terminate the contract or should be estopped from doing so. Kauthar also argues that by giving the debtor 21 days to restore its rights under the agreement, Tongasat could not terminate the agreement without giving Rimsat yet another notice of default and an additional forty-five days to cure.[10]

The trustee does not have a strong case in support of its argument that, by entering into negotiations in an attempt to salvage the relationship, Tongasat either waived its right to terminate the contract as a result of Rimsat's default or should be estopped from doing so. Quite to the contrary, it seems that Tongasat's actions have been entirely consistent with the position that it expected Rimsat fulfill its financial obligations under the contract and that Rimsat's continued right to occupy the orbital slots depended upon its doing so. Tongasat's willingness to enter into negotiations, designed to reach an agreement which would allow Rimsat to cure the default in payments with something less than cash on the barrelhead, does not rise to the level of having given up the right to terminate the contract if the default was not cured. This is especially so since those negotiations did not produce any agreement prior to Tongasat terminating the contract on December 23, 1994. Similarly, the evidence does not seem to support the theory that Tongasat said or did anything, upon which Rimsat relied, such that Tongasat would be estopped from either terminating the contract when the default was not cured or contending that it had done so.

Tongasat's letter of January 3, 1995 does not change the court's perception. While the agreement referenced in that letter may have provided Rimsat with the opportunity to restore the contract, it did not effect that restoration. Restoration would only occur if Rimsat actually performed, by making the payments required. Not only did Rimsat fail to perform as it had agreed to, but it almost immediately repudiated the agreement by its letter of January 4, 1995. *See* Ex. 27. Given this action, it would seem that the party most likely to be estopped would be Rimsat, not Tongasat.

The relationship with Rimsat was apparently one that Tongasat valued highly and it tried to preserve the parties' agreement. Nonetheless, it consistently took the position that it expected Rimsat to live up to its end of the bargain and that the contract would be terminated if Rimsat did not do so. While Rimsat's principals may not have believed that Tongasat would follow through with exercising its right to terminate the contract, this belief was not the result of anything Tongasat did to waive that right or that would estop it from doing so. Rimsat apparently thought it was so important to Tongasat that it could string Tongasat along indefinitely and Tongasat would continue to put up with being put off. Rather than being the stuff of waiver and estoppel, the court is left with the impression that Rimsat tried to play hardball, misjudged the party on the other side of the table, and lost.

### Tongasat's Violation of the Automatic Stay

Rimsat had acquired the satellites in question from the Russians, who operated the facilities which controlled both the satellites' orbital positions and the transponders on the satellites used to send and receive signals. Consequently, without the assistance of the Russians, Rimsat had no control over the movement of the satellites or their transponders.

On or about September 1, 1995, the Russians took full control over the satellites. The Russian Space Agency purported to terminate Rimsat's interest in the satellites and transfer that interest to Intersputnik, a Russian entity. Intersputnik informed Rimsat's customers that Rimsat was no longer able to provide services and directed those customers to enter into contracts with and to pay Intersputnik for the use of the satellites. The Russians took these actions despite the

---

**10.** The court cannot give any credence to this argument. The tenor of Tongasat's letter of January 3, 1995 makes it clear that Rimsat's rights and opportunities depended upon its performance within those twenty-one days and that a failure to do so would result in default without further notice.

automatic stay of 11 U.S.C. § 362(a), a temporary restraining order issued by this court on August 30, 1995, and a preliminary injunction issued on September 7, 1995, *see* Ex. B. Since September 1, 1995, the Russians have maintained full control over the satellites and access to them—effectively ending Rimsat's existence as an operating entity—leaving it without operational assets or paying customers.

■ One of the trustee's counterclaims against Tongasat contends that Tongasat bears some responsibility for the Russians' actions because Tongasat did not require the Russians to vacate Rimsat's orbital slots and ultimately entered into agreements allowing the Russians to lease those positions, in violation of the automatic stay. Consequently, the trustee seeks damages alleging that Tongasat's actions violated the automatic stay. Kauthar contends that those actions also violated the preliminary injunction.[11]

■ It is questionable whether Tongasat did anything to violate the stay.[12] Tongasat never did anything to prevent Rimsat from using either the orbital slots or the satellites. It was the Russians, not Tongasat, who seized the satellites, diverted their revenues and left Rimsat without the means to use (or pay for) the orbital positions. Furthermore, it does not appear that Tongasat could have done anything to stop them.

Kauthar would have the court believe that Tongasat somehow conspired with the Russians. If so, Tongasat certainly got the short end of the stick. Under its agreement with the Russians, it received only a fraction of what it was being paid by the Chapter 11 trustee. A much more reasonable interpretation of its actions is that Tongasat was simply making the best of a very bad situation—a situation that was not of its making. The Russians controlled the satellites, Rimsat's revenue stream was gone, and, as a result, the Chapter 11 trustee had ceased making payments to Tongasat. Unless Tongasat came to terms with the Russians, they were apparently going to reposition the satellites. Tongasat could either deal with the Russians and receive something for the use of its orbital slots, or refuse to do so and be left with nothing. Tongasat took the understandable position that it would like the satellites to remain in place and that it should be paid something by whoever operated them.

Besides the doubts about whether Tongasat violated the stay, there are also problems associated with proving damages as the result of Tongasat's alleged stay violation. This claim is largely premised on the proposition that Tongasat had not effectively terminated the parties' agreement prior to the petition. If Tongasat did anything at all to violate the stay, it was with regard to Rimsat's interest in the orbital slots. Yet, given the court's analysis of Tongasat's declaratory judgment action, it appears that the debtor's interest in those slots had already been terminated so that, as of the date of the petition, it was little more than a tenant at will. Such an interest is easily ended, *see Matter of Schewe*, 94 B.R. 938, 950 (Bankr.W.D.Mich. 1989) (landlord's desire to terminate a tenancy at will is cause for relief from the automatic stay), and would have little value.[13] Furthermore, while the estate complains of

11. The court does not agree that Tongasat is "in active concert or participation with" the Russians so that it is bound by the preliminary injunction. *See* Ex. B, p. 5. More importantly, that injunction only prohibits actions that interfere with "Debtor's interest in [the satellites] and the[ir] operation ..." *Id.* The only entities that appear to have taken any action with regard to the debtor's interest in the satellites are the Russians. Tongasat's actions, allowing the Russians to fly those satellites in Rimsat's orbital slots, were not prohibited by the preliminary injunction.

12. To the extent there may still be a contention that Tongasat violated the automatic stay by talking with the Russians in connection with the formulation and proposal of a Chapter 11 plan, the court rejects the suggestion. The automatic stay does not prohibit creditors from communicating with one another or negotiating with regard to either a proposed plan or other aspects of the bankruptcy case.

13. Given the Russians' actions, any value the satellite slots might have would seem to depend on the estate's ability to sell and assign its interest in them to a third party. Since that interest probably terminated prior to the petition, there is nothing of substance the estate could sell. Even if the that interest had not been terminated prior to the petition, the trustee cannot assign the debtor's rights under a contract unless it assumes the contract and, in doing so, must, *inter alia,* cure or provide adequate assurance for the

the loss of an income stream in excess of $1 million per month, this figure represents its gross income. The damages the estate might be entitled to recover may, more appropriately, be limited to its net profits, which may have been nonexistent. At best, the damages from Tongasat's actions would seem to be limited to the net profit the estate might have been able to earn during the short time before it was required to vacate the slots.[14]

The trustee's doubts about his ability to prove that Tongasat violated the automatic stay and, if it did, that Rimsat suffered any meaningful damages as a result, are fully justified.

### The Estate's Preference Claim

Mr. Levin correctly opines that the preference claim against Tongasat, by which the estate seeks to recover three payments totaling $425,000 made during the ninety days before bankruptcy, is the estate's strongest claim. Even so, the trustee faces significant obstacles to proving this claim, two of which involve the fact that the estate may be solvent and able to pay creditors in full.

One of the elements the trustee must prove in order to recover any preferential transfer is that the debtor was insolvent at the time the transfer was made. See 11 U.S.C. § 547(b)(3); In re Taxman Clothing Co., Inc., 905 F.2d 166, 170 (7th Cir.1990)

(balance-sheet insolvency determines whether payments made to a creditor are voidable preferences). While the Code creates a presumption of insolvency during the ninety days immediately preceding the petition, see 11 U.S.C. § 547(f), on their face, Rimsat's bankruptcy schedules appear to indicate that it was solvent.[15] The trustee must also prove that the challenged transfers enabled Tongasat to receive more than it would have if the estate had been liquidated and the transfers had not been made. See 11 U.S.C. § 547(b)(5). The trustee believes that administration of the estate, together with the elimination of Tongasat's claim and the resolution of other disputed claims, may well result in a 100% distribution to unsecured creditors.[16] In that event, there would be no recoverable preference. See In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458, 465 (6th Cir.1991) (unless the estate is sufficient to provide a 100% distribution, any unsecured creditor who receives a payment during the preference period is in a position to receive more than is would have received under a chapter 7 liquidation); In re Richards, 92 B.R. 369 (Bankr.N.D.Ind.1988) (same). These concerns support the trustee's decision to accept the proposed settlement.

### Other Considerations

Another factor that influenced the trustee's decision to agree to the proposed settle-

---

prompt cure of any default and compensate the other party for any actual pecuniary loss resulting from the default. See 11 U.S.C. § 365(b). The estate does not have the financial ability to assume the Rimsat's contract with Tongasat.

**14.** Although Rimsat was permitted to continue to occupy the orbital slots following termination of the contract, it was required to end that occupancy on thirty days written notice and, in some circumstances, immediately. See Ex. 25, p. 2.

**15.** Rimsat lists total assets of $496,230,691.45 and total liabilities of $59,131,479.84. Even after deducting the scheduled value of a claim against Carl Hilliard (estimated at $300,000,-000), it would appear that Rimsat's assets may have exceeded its liabilities. See Ex. 12, Debtor's Schedule B.

**16.** The filing of Kauthar's claim for $115,000,000 does not change the trustee's opinion that the estate is faced with a 100% scenario. The claims of equity security holders, arising out of fraud or

violations of securities laws, are commonly subordinated to the claims of other unsecured creditors. See e.g. Matter of Stirling Homex Corp., 579 F.2d 206 (2d Cir.1978), cert. denied sub nom. Jezarian v. Raichle, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); In re Granite Partners, L.P., 208 B.R. 332 (Bankr.S.D.N.Y.1997); In re The Securities Group 1980, 124 B.R. 875 (Bankr. M.D.Fla.1991); In re Amarex, Inc., 53 B.R. 888 (Bankr.W.D.Okla.1985), rev'd on other grounds, 78 B.R. 605 (W.D.Okla.1987). Furthermore, the possibility that an equity security holder might, on the morning of trial (more than two years into the case), file a claim for more than one hundred million dollars is not the kind of thing the trustee should be required to seriously consider in determining that a proposed settlement is in the best interests of the estate and creditors. "When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." Stirling Homex, 579 F.2d at 213, (quoting Newton Nat. Bank v. Newbegin, 74 F. 135, 140 (8th Cir.1896)).

ment is the credibility of witnesses. *See In re Trovato,* 131 B.R. 650, 654 (N.D.Ill.1991). In proving many of the estate's claims against Tongasat, the trustee will largely have to rely on the testimony of Rimsat's principals, Mr. Simon, Mr. Sternberg and Mr. Hilliard. In the face of the contrary documentary evidence, the trustee fears that oral testimony from these individuals will lack credibility. This is a legitimate consideration and not without some foundation.

Kauthar argues that the trustee did not solicit or consider its input on the propriety of the compromise. The argument has no merit. In the course of his investigation, the trustee asked to meet with counsel for the various parties and constituencies involved in Rimsat's bankruptcy proceeding, including Kauthar. He met with William Howard, one of Kauthar's attorneys, prior to the § 341 meeting, which was held on June 2, 1997. Mr. Howard advised the trustee that he would be preparing a letter outlining Kauthar's concerns and its position regarding the case, which Mr. Levin could expect in about a week. The promised letter never came. Kauthar was given the opportunity to make its concerns known. After having promised to do so and then having failed to follow through with that commitment, Kauthar cannot complain that it was not consulted before the trustee agreed to the proposed settlement.

■ Kauthar also argues that the trustee has not conducted enough discovery with respect to the claims being settled. The trustee is not, however, required to complete comprehensive discovery, as Kauthar seems to argue it must, before settling a claim. Indeed, one purpose of a settlement is to avoid the costs and delay associated with discovery and litigating a claim to completion. *See In re Energy Co–op. Inc.,* 173 B.R. 363, 371–72 (N.D.Ill.1994). All that is required is for the trustee to educate himself on the merits of the claims to be settled so that he can make an informed decision concerning the proposed settlement and the best interests of the estate. The court is satisfied that Mr. Levin has done so.

Kauthar contends that if the trustee would only hire more attorneys and more experts, he would be able to discover "hundreds of millions of dollars" of claims against Tongasat which are being given up by the proposed compromise. What those claims might be, Kauthar does not say. Instead, it argues that the trustee's failure to have discovered them proves that he has not adequately investigated the situation [17] and, therefore, the court must deny the motion.

The court has no doubt that the estate could use its resources to retain attorneys who would be willing to assert "hundreds of millions of dollars" worth of claims against Tongasat. The court has no reason to believe, however, that this could be done while simultaneously fulfilling counsel's ethical obligations. Neither does the court have any reason to believe that the results of such an investment of time, effort and money would increase the size of the estate. To the contrary, the most likely result of such a course of action would be to delay the administration of the case and deplete (if not exhaust) the resources that are available for distribution.

The court cannot overlook the fact that, as an equity security holder, Kauthar will not receive any type of distribution unless and until all creditors are paid in full. Although the trustee is optimistic that the estate should be able to fully pay all of Rimsat's creditors, whether anything will then be left for distribution on account of the interests of equity security holders appears to be problematic. Consequently, Kauthar has nothing to lose by opposing the compromise and by arguing that the trustee should litigate rather than settle. *See Depoister,* 36 F.3d at 587.

**Conclusion**

■ It remains for the court to identify the lowest point in the reasonable range of litigation possibilities. *See Energy Co–op.,* 886 F.2d at 929. For this purpose, the most likely outcome of the claims litigation will be the allowance Tongasat's claim against the estate, if not for the full $2.4 million, at least for a substantial sum well in excess of one million dollars. The defenses and offsets

17. See note 2.

raised by the trustee to reduce the amount of Tongasat's claim and obtain some type of affirmative recovery have little likelihood of succeeding. Indeed, weak as it is, it appears that the best vehicle for reducing Tongasat's claim may be the debtor's rights under the agreement's "most favored nation" clause. Yet, even here, it seems that any resulting reduction will not be as large as the claim objection initially suggests. As for the possibility of any affirmative recovery, with the exception of the preference claim, this is not a reasonable likelihood. In the preference litigation, the best case scenario for the estate would result in a recovery of $425,000.[18] Lastly, there is Tongasat's declaratory judgment action, which will probably result in a determination that the contract between the parties was terminated prior to the petition.

The lowest point in the reasonable range of litigation possibilities is no higher than a determination that Rimsat owed Tongasat well in excess of one million dollars and the contract between them was terminated prior to the petition, with the estate able to recover something on its preference claim. The estate would end up with $425,000, at best, and the obligation to make a substantial distribution on account of Tongasat's allowed claim. Under the proposed settlement, the estate receives $500,000 and Tongasat's claim will be withdrawn. The estate would be freed from the obligation to make any distribution to Tongasat and the distribution to other parties would be enhanced accordingly.

The court is satisfied that Mr. Levin has reached an appropriately informed decision concerning the proposed settlement, after conducting a satisfactory investigation of the case and the relative strengths and weaknesses of the claims in question. As a result of the settlement, a $2.4 million claim will disappear, leaving that much more, in addition to Tongasat's contribution of $500,000, to be distributed to other creditors. The settlement will avoid what will almost certainly be

expensive and protracted litigation, which is likely only to multiply the estate's attorneys fees and administrative expenses and to delay the resolution of this case. The proposed settlement falls well within the reasonable range of litigation possibilities, is in the best interests of the estate and should be approved.

Kauthar's objections to the Trustee's motion for authority to compromise Tongasat matters are overruled and that motion will be granted. An order doing so will be entered.

---

**18.** Allowing Tongasat's claim for an amount well in excess of one million dollars dramatically alters the calculus associated with the "receives more" aspect of the preference claim. Although there is still the suggestion that the estate may have been solvent at the time of the transfer, there is also the presumption of insolvency operating in favor of the trustee. Accordingly, the court evaluates the settlement based on the proposition that the estate will be victorious in that litigation. It does so, however, recognizing that Tongasat has raised affirmative defenses which, if successful, will defeat or diminish the trustee's recovery. This is the reason the court characterizes the preference recovery as a best case scenario.