In re **FORT WAYNE TELSAT, INC., Debtor.**

**R. David Boyer, Plaintiff,**

v.

**The Trustees of Indiana University and Indiana Higher Education Telecommunication System, Defendants.**

**Bankruptcy No. 05–12177.**
**Adversary No. 07–1287.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

April 25, 2010.

R. David Boyer II, Fort Wayne, IN, for Plaintiff.

Jeremy N. Gayed, Patrick G. Murphy, Thomas P. Yoder, Barrett & McNagny LLP, Fort Wayne, IN, for Defendants.

*MEMORANDUM OF DECISION CONCERNING OBJECTION TO TRUSTEE'S/PLAINTIFF'S PROPOSED COMPROMISE OF ADVERSARY PROCEEDING*

J. PHILIP KLINGEBERGER,
Bankruptcy Judge.

This adversary proceeding was commenced by a complaint filed on October 3, 2007 by the plaintiff, R. David Boyer, as Trustee of the Chapter 7 estate of Fort Wayne Telsat, Inc. ("Trustee") against The Trustees of Indiana University ("IU") and Indiana Higher Education Telecommunication System ("IHETS") as defendants. Due to the recusal of the Honorable Robert E. Grant, by order entered on October 24, 2007 this adversary proceeding and all matters related to it were reassigned to the undersigned. On March 18, 2008, the Trustee, and IU and IHETS, filed their Amended Joint Motion to Approve Settlement,[1] to which was attached as exhibit "A" the parties' Settlement Agreement and Release. Putting aside the abundant legalese customarily included in settlement agreements, the principal provisions of the settlement were that in exchange for $100,000.00 paid to the Trustee by IU and IHETS, the Trustee would disclaim "any right, title or interest in (FCC license for an educational broadband service Station WLX 236)"; the Trustee, and IU and IHETS would mutually release all claims of any nature whatsoever against the opposing party/parties; and that upon the court's approval of the compromise, the parties would dismiss this adversary proceeding with prejudice. This proposed compromise was noticed to all creditors and parties-in-interest in accordance with the provisions of applicable law. On April 7, 2008, JAS Family Limited Partnership ("JAS") filed a timely objection to the compromise. This objection gave rise to a contested matter pursuant to Fed. R.Bankr.P. 9014.

The court has jurisdiction over the adversary proceeding and the contested matter pursuant to 28 U.S.C. § 1334(a) and (b); 28 U.S.C. § 157(a); and N.D.Ind.L.R. 200.1. The adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E); the contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) and (O).

JAS' objection asserts that the compromise proposed by the Trustee is not in the best interest of the bankruptcy estate because in the exercise of his business judgment with respect to matters relating to the compromise, the Trustee failed to undertake an adequate investigation of circumstances regarding the subject matter of litigation and entered into a compromise which is not the reasonable equivalent of the value of the estate's claims surrendered by the settlement.

The record applicable to determination of the contested matter was made by means of a trial which was held on December 4, 2008 and was then concluded on March 5, 2009. Following the trial, the parties submitted legal memoranda in support of their positions.

To avoid unnecessary suspense as to the outcome of this decision—akin to that encountered in an Easter egg hunt until someone exuberantly exclaims that he/she has found the golden egg—the court determines that the Amended Joint Motion will be granted, and that the compromise effected thereby will be approved.

---

1. This amended motion supplanted the prior joint motion filed by the parties on March 17, 2008.

The standards for reviewing whether or not a contested compromise by a trustee will be approved have been expansively addressed by the United States Supreme Court, by the United States Court of Appeals for the Seventh Circuit, and by United States Bankruptcy Courts in the Seventh Circuit.

The general parameters of review, and of the court's involvement in the review process, were stated by the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), as follows: [2]

> Compromises are 'a normal part of the process of reorganization.' *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed. 110 (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court. *National Surety Co. v. Coriell*, 289 U.S. 426, 436, 53 S.Ct. 678, 682, 77 L.Ed. 1300 (1933). The requirements of ss 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. ss 574, 621(2), that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations. *Ashbach v. Kirtley*, 289 F.2d 159 (C.A.8th Cir.1961); *Conway v. Silesian–American Corp.*, 186 F.2d 201 (C.A.2d Cir.1950). The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants can-

not affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co.*, 196 F.2d 484 (C.A.7th Cir.1952). There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

The basic standards for review of compromise of an adversary proceeding were stated in *In re Doctors Hospital of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007), as follows:

> Bankruptcy courts may approve adversary litigation settlements that are in the best interests of the estate. *In re Energy Co–op., Inc.*, 886 F.2d 921, 927–29 (7th Cir.1989); *In re Am. Reserve Corp.*, 841 F.2d 159, 161 (7th Cir.1987). The linchpin of the "best interests of the estate" test is a comparison of the value of the settlement with the probable costs and benefits of litigating. *In re Energy Coop.*, 886 F.2d at 927. Among the factors the court considers are the litigation's probability of success, complexity, expense, inconvenience, and delay, "in-

---

**2.** Although the case dealt with court review of confirmation of a Chapter 11 plan, the essen-

tial elements of review of a compromise were present in those circumstances.

cluding the possibility that disapproving the settlement will cause wasting of assets." *In re Am. Reserve,* 841 F.2d at 161. As part of this test, the value of the settlement must be reasonably equivalent to the value of the claims surrendered. This reasonable equivalence standard is met if the settlement falls within the reasonable range of possible litigation outcomes. *In re Energy Co-op.,* 886 F.2d at 929; *In re N.Y., New Haven & Hartford R. Co.,* 632 F.2d 955, 960 (2d Cir.1980); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Depoister v. Mary M. Holloway Found.,* 36 F.3d 582, 586 (7th Cir.1994). Because litigation outcomes cannot be predicted with mathematical precision, only if a settlement falls below the low end of possible litigation outcomes will it fail the reasonable equivalence standard. *In re Energy Co-op.,* 886 F.2d at 929.

The bankruptcy court's approval of the settlement is reviewed deferentially, for abuse of discretion. *Depoister,* 36 F.3d at 586. The bankruptcy court must independently evaluate the settlement, not simply accept the recommendation of the trustee. *TMT Trailer Ferry,* 390 U.S. at 424, 88 S.Ct. 1157; *Depoister,* 36 F.3d at 586–87; *In re Am. Reserve,* 841 F.2d at 162. If the decision demonstrates a command of the case, we will not engage in second-guessing; the bankruptcy court is in a better position "to consider the equities and reasonableness of a particular compromise." *In re Am. Reserve,* 841 F.2d at 162. Factual findings are reviewed for clear error; legal conclusions are reviewed de novo. Fed. R. Bankr.P. 8013; *In re Crosswhite,* 148 F.3d 879, 881 (7th Cir.1998).

The foregoing was essentially a distillation of the standards stated in *LaSalle Nation-* al Bank v. Holland, 841 F.2d 159, 161–162 (7th Cir.1987):

A bankruptcy judge may approve a settlement in a liquidation proceeding if the settlement is in the estate's best interests. *In re A & C Properties,* 784 F.2d 1377, 1380, 1382 (9th Cir.), *cert. denied, Martin v. Robinson,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); *In re Blair,* 538 F.2d 849, 852 (9th Cir.1976); *In re Patel,* 43 B.R. 500, 505 (N.D.Ill.1984); *In re Central Ice Cream Co.,* 59 B.R. 476, 487 (Bankr. N.D.Ill.1985). Central to the bankruptcy judge's determination is a comparison of the settlement's terms with the litigation's probable costs and probable benefits. Among the factors the bankruptcy judge should consider in his analysis are the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets). *See In re A & C Properties,* 784 F.2d at 1381; *In re Blair,* 538 F.2d at 851; *cf. McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 427 (7th Cir.1977) (noting similar factors to consider in approving a settlement in a class action). The bankruptcy judge should also consider the creditors' objections to the settlement; however, the creditors' views are not controlling. *In re A & C Properties,* 784 F.2d at 1382.

The appellants insist that a bankruptcy judge may approve a settlement only if it is "fair and equitable." "Fair and equitable" is a term of art that means that " 'senior interests are entitled to full priority over junior ones.' " *In re AWECO, Inc.,* 725 F.2d 293, 298 (5th Cir.) (citation omitted), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). In a settlement context, "fair

and equitable" means that the settlement reasonably accords with the competing interests' relative priorities.

Any distinction between the "best interests of the estate" and the "fair and equitable" standards is of little consequence. The cases appellants cite for the "fair and equitable" standard considered the factors we have noted above. *See, e.g., Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re A & C Properties,* 784 F.2d at 1381. Moreover, in comparing the settlement's terms with the litigation's probable costs and probable benefits, the central inquiry in determining whether a proposed settlement is in an estate's best interests, the bankruptcy judge must necessarily examine the relative priorities of the contested claim and the estate's other claims. Claims with different priorities will have different settlement values. For example, administrative expenses have priority over general, unsecured claims; therefore, all else being equal, an administrative expense claim will have a higher settlement value than a general unsecured claim. Properly viewed then, the "fair and equitable" analysis—that is, comparing claims' relative priorities—is just one factor for the bankruptcy judge to consider in determining whether a settlement is in the estate's best interest.

 The role of the bankruptcy court in determining whether or not a compromise which has been objected to should be approved is a difficult one. Obviously, the case/controversy to which the compromise relates cannot be fully tried before the court to determine the efficacy of the compromise. However, the standards imposed upon bankruptcy courts for review of compromises result in essentially "mini-trials"

of the case itself, many times involving submission of evidence far beyond that necessarily considered by the trustee in legitimately reviewing the case for compromise, or by the objectant in initiating a contested matter to oppose the compromise. The standard for court review was generally stated in *LaSalle National Bank v. Holland,* 841 F.2d 159, 162 (7th Cir. 1987) as follows:

(The bankruptcy judge) may not simply accept the trustee's word that the settlement is reasonable, nor may he merely "rubber-stamp" the trustee's proposal. The bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement and make an "informed and independent judgment" about the settlement. *See TMT Trailer Ferry,* 390 U.S. at 424, 434, 88 S.Ct. at 1163, 1168; *In re A & C Properties,* 784 F.2d at 1383.

In exercising his discretion, the bankruptcy judge must also give the reviewing court "some basis for distinguishing between well-reasoned conclusions arrived at after comprehensive consideration of all relevant factors, and mere boilerplate approval ... unsupported by evaluation of the facts or analysis of the law." *TMT Trailer Ferry,* 390 U.S. at 434, 88 S.Ct. at 1168. In other words, the bankruptcy judge must make findings and explain his reasoning sufficiently to show that he examined the proper factors and made an informed and independent judgment.

*See also, In re Energy Cooperative, Inc.,* 886 F.2d 921, 928–29 (7th Cir.1989). As stated in *Depoister v. Mary M. Holloway Foundation,* 36 F.3d 582, 585–586 (7th Cir. 1994):

Under Bankruptcy Rule 9019(a), the bankruptcy court may approve a compromise or settlement "[o]n motion by the trustee and after a hearing on notice

to creditors, the debtor and indenture trustee...." In conducting a hearing under Rule 9019(a), the bankruptcy court is to determine whether the proposed compromise is fair and equitable, *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), and in the best interests of the bankruptcy estate, *In re American Reserve Corp.,* 841 F.2d 159, 161 (7th Cir.1987). In making this determination, a bankruptcy judge is required to apprise himself "of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer Ferry, Inc.,* 390 U.S. at 424, 88 S.Ct. at 1163; *see also American Reserve Corp.,* 841 F.2d at 161. To this end, the bankruptcy judge should:

> form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation.

*TMT Trailer Ferry, Inc.,* 390 U.S. at 424–25, 88 S.Ct. at 1163.

▆▆▆▆ Because the calculus of settlements is not based upon definitive determination of asserted claims or defenses, the review of a compromise involves analysis of possible ranges of best case/worst case results, and the realization that the compromise will be valid if it falls within a range defined at its bottom line as the lowest possible reasonably estimated settlement result. As stated in *In re Energy Cooperative, Inc.,* 886 F.2d 921, 928–929 (7th Cir.1989), the methodology is the following:

> This is the methodology that the appellants would have the district court follow when approving a settlement agreement. The world of settlements, however, does not read like a balance sheet-nor should it. Assigning value to contested claims cannot be done with the same precision as assigning value to a bill for the receipt of goods. Who is to say whether the Trustee has a 10% or a 20% chance of recovering on the alter ego claim? Under the appellants' methodology, that 10% difference is worth $30 million. Furthermore, assuming theoretically that the alter ego claim is in fact worth $30 million, inducing the Member–Owners to actually pay $30 million for it in practice is quite another matter. The appellants' myopic valuation method also fails to take into account that the burdens of litigation do not fall evenly in this kind of a situation. Delay inures to the benefit of the Member–Owners and Banks because the Trustee seeks to collect from them. Furthermore, the Banks and Member–Owners are in a better position to bear the burden of litigation costs. The Trustee's resources are more limited and strategic decisions are influenced by the fact that for each dollar spent on litigation, there is one less dollar available for distribution to general creditors. Courts thus do not require the use of a rigid mathematical formula to set dollar values on disputed claims because to do so "would create an illusion of certainty where none exists and place an impracticable burden on the whole ... [settlement] process." *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 318 U.S. 523, 565–66, 63 S.Ct. 727, 749–50, 87 L.Ed. 959 (1943). *See also In re Penn Central Transp. Co.,*

596 F.2d 1102, 1114 (3rd Cir.1979) ("[T]he weighing of a claim against compensation cannot be an exact [determination]. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.").

Rather, the job of the reviewing court is to determine whether "the value of the proposed compromise distribution is *reasonably* equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved." *In re New York, N.H. & H.R. Co.*, 632 F.2d at 955 (emphasis added). The test for reasonable equivalence is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Id.* (*citing TMT*, 390 U.S. at 424–25, 88 S.Ct. at 1163–64; *In re Penn Central*, 596 F.2d at 1114; *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960); *In re California Associated Products Co.*, 183 F.2d 946, 949–50 (9th Cir.1950); *In re Equity Funding Corp.*, 416 F.Supp. 132, 145 (C.D.Cal.1975)). A challenged settlement fails this test only if it "fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)).

Considerations of uncertain results under applicable law—without actually deciding the controlling legal issues—also figure into the calculus; *see, In re Andreuccetti*, 975 F.2d 413, 420–421 (7th Cir.1992).

▮ Although the trustee's determination of a compromise is not controlling, the trustee is invested with a great deal of discretion as to the exercise of his/her business judgment, as stated in *In re Consolidated Industries Corp.*, 330 B.R. 712, 715 (Bankr.N.D.Ind.2005) as follows:

Determining whether there are genuine issues of material fact concerning the trustee's duty as to the prosecution of the claims in question must begin with an understanding of the nature of that duty. Only after we understand the nature and scope of the trustee's duty to administer the assets of the estate can we determine whether there has been any dereliction of that duty. A bankruptcy trustee is not required to prosecute every cause of action belonging to the bankruptcy estate. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1346–47 (7th Cir.1987); *In re Reed*, 178 B.R. 817, 821 (Bankr. D.Ariz.1995). Instead, the trustee is given a substantial degree of discretion in deciding how best to administer the estate committed to his care and his actions are measured by a business judgment standard. *In re Fulton*, 162 B.R. 539, 540 (Bankr.W.D.Mo.1993); *In re Cult Awareness Network, Inc.*, 205 B.R. 575 (Bankr.N.D.Ill.1997); *In re Curlew Valley Associates*, 14 B.R. 506, 513 (Bankr.D.Utah 1981); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir.1982). So long as the trustee's decision concerning how or whether to administer an asset or to pursue a cause of action falls within the proper scope of the trustee's business judgment, the trustee's decision will be upheld. *In re Cult Awareness*, 205 B.R. 575; *In re Fulton*, 162 B.R. at 540; *In re Wilson*, 94 B.R. 886, 888 (Bankr.E.D.Va.1989).

This explains the reason that a compromise within the lowest reasonably anticipated settlement range will be approved.

Excellent overviews of all of the foregoing requirements have been provided by

two bankruptcy courts sitting in the Seventh Circuit. First, in *In re Rimsat, Ltd.,* 224 B.R. 685, 688 (Bankr.N.D.Ind.1997), the following was stated:

Whether or not a proposed settlement is approved is a matter committed to the bankruptcy court's discretion. *Matter of Andreuccetti,* 975 F.2d 413, 421 (7th Cir.1992); *In re American Reserve Corp.,* 841 F.2d 159, 162 (7th Cir.1987). As observed by the Seventh Circuit, this requires the court to actually exercise its discretion. We are not permitted to just accept the representation that the settlement is fair and reasonable. Instead, the court must familiarize itself with all of the attendant facts and circumstances, in order to "make an 'informed and independent judgment' about the settlement." *American Reserve Corp.,* 841 F.2d at 162 (citation omitted). Among the factors which the court considers in its evaluation are the nature and complexity of the dispute and its probable outcome, together with the expense, inconvenience and delays necessarily attendant to litigation. Objections to the settlement must also be considered, although the views of objecting creditors are not controlling. *Id.* at 161–62.

While the court must make an informed and independent judgment concerning the propriety of the proposed settlement, it need not make an independent investigation of the facts and it may give weight to the trustee's informed judgment and consider the competency and experience of counsel who support the compromise. *Depoister v. Mary M. Holloway Foundation,* 36 F.3d 582, 587 (7th Cir.1994); *In re International Distribution Centers, Inc.,* 103 B.R. 420, 422–23 (S.D.N.Y.1989); *In re Drexel Burnham Lambert Group., Inc.,* 134 B.R. 493, 496 (Bankr.S.D.N.Y.1991); *In re Del Grosso,* 106 B.R. 165, 168 (Bankr.

N.D.Ill.1989). The court also need not conduct a mini-trial on the merits of the case. *International Distribution,* 103 B.R. at 423; *Drexel Burnham,* 134 B.R. at 496–97. *See also, Depoister,* 36 F.3d at 586 (evidentiary hearing not required).

[T]he bankruptcy court's responsibility is not to decide the numerous questions of law and fact raised by parties, but rather to canvas the issues in order to determine whether the settlement "falls below the lowest point in the range of reasonableness." *In re Goldstein,* 131 B.R. 367, 370 (Bankr.S.D.Ohio 1991) (citations omitted). *See also, In re Lawrence & Erausquin, Inc.,* 124 B.R. 37, 38 (Bankr.N.D.Ohio 1990) (what is being sought is not resolution of issues but their identification and clarification).

"The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *Matter of Energy Co–op., Inc.,* 886 F.2d 921, 927 (7th Cir.1989). As the proponent of the settlement, the trustee has the burden of proving that it is. *In re Bell & Beckwith,* 93 B.R. 569, 574 (Bankr.N.D.Ohio 1988). The central inquiry in the determination involves "a comparison of the settlement's terms with the litigation's probable costs and probable benefits." *American Reserve Corp.,* 841 F.2d at 161. The court must examine the terms of the proposed settlement, in light of the risks and rewards of not settling, and determine whether the proverbial bird in the hand is worth two in the bush. While this is not and cannot be the subject of a rigid, mathematical analysis, there must, nonetheless, be some type of correspondence between what is being given in connection with the compromise and what might be received if the dispute was prosecuted to its ulti-

mate conclusion. Thus, the consideration being given in connection with the settlement must be "reasonably equivalent" to the value of the disputed claim, by "fall[ing] within the reasonable range of litigation possibilities." *Energy Co-op.*, 886 F.2d at 929 (quoting *Matter of New York, N.H. & H.R. Co.*, 632 F.2d 955 (2d Cir.1980)); *Matter of Krizmanich*, 139 B.R. 456, 460 (Bankr.N.D.Ind. 1992).

In *In re Del Grosso*, 106 B.R. 165, 167–168 (Bankr.N.D.Ill.1989), the following was stated:

Bankruptcy Rule 9019(a) empowers the Court to approve a proposed compromise or settlement and provides in relevant part that: "[o]n motion by the trustee and after a hearing on notice to creditors ... and to such other persons as the Court may designate, the court may approve a compromise or settlement." Fed.R.Bankr.P. 9019(a). Rule 9019(a) is essential the same as former Rule 919(a). The Rule has been construed to give the Court broad authority to approve compromises. *In re Sherman Homes, Inc.*, 28 B.R. 176, 177 (Bankr.D.Me.1983). Courts generally recognize that compromises are favored. *See In re New York, New Haven & Hartford Railroad Co.*, 632 F.2d 955 (2d Cir.1980), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). The purpose of a compromise is to allow the Trustee and the creditors to avoid the expenses and burdens associated with litigating contested claims. *Matter of Walsh Construction, Inc.*, 669 F.2d 1325, 1328 (9th Cir.1982).

In spite of the requirement of Court approval, the Trustee must initially determine whether litigation should be settled and whether the terms are in the best interest of the estate. The Trustee's power to compromise extends to all controversies affecting the estate and not merely those involved in pending suits. *Florida Trailer and Equipment Company v. Deal*, 284 F.2d 567, 569 (5th Cir.1960). The requirement that adequate information be set forth in sufficient detail to enable approval of a settlement parallels the same requirement applicable to consideration of settlements in class actions or derivative actions pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure. *In re Lion Capital Group*, 49 B.R. 163, 176 (Bankr.S.D.N.Y.1985).

The decision to approve an application to compromise is a matter within the discretion of the Court. *In re Aweco [AW-ECO ], Inc.*, 725 F.2d 293, 297 (5th Cir. 1984) *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *In re Sherman Homes, Inc.*, 28 B.R. at 177. The decision will not be disturbed on appeal absent a clear showing of abuse of discretion. *In re Patel*, 43 B.R. 500, 504–505 (N.D.Ill.1984); *In re Bell & Beckwith*, 77 B.R. 606, 611 (Bankr. N.D.Ohio 1987) *aff'd*, 87 B.R. 472 (N.D.Ohio 1988[1987] ). Generally, the Court will approve a settlement if it is in the best interest of the estate. *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir.1987); *In re A & C Properties*, 784 F.2d 1377, 1380–1382 (9th Cir. 1986), *cert. denied, Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); *In re Heissinger Resources Ltd.* 67 B.R. 378, 383 (C.D.Ill.1986); *Patel*, 43 B.R. at 505; *In re Central Ice Cream Co.*, 59 B.R. 476, 487 (Bankr. N.D.Ill.1985) ("In approving a settlement in a liquidation proceeding, the Court must determine what course of action is in the best interest of the Estate, with major consideration to the interests of creditors.... A proposed settlement in a liquidation proceeding should be approved if it provides for 'the

best possible realization upon the available assets ... without undue waste or needless or fruitless litigation.'" *Id.* at 487 (*quoting In re Kearney,* 184 F. 190, 192 (N.D.N.Y.1910))).

Prior to approving a settlement, the Court has the duty to review the merits of the agreement to ensure that the compromise is fair. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). ("*TMT Trailer*").[FN1] In exercising its discretion, the bankruptcy court must weigh all factors bearing on the reasonableness of the settlement including: 1) the probability of success in the litigation; 2) the difficulties, if any, to be encountered in the matter of collection; 3) the complexity of the litigation involved, and the expense and inconvenience in delay necessarily attending it; and 4) the paramount interest of the creditors and a proper deference to their reasonable views. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128, 1135 (8th Cir. 1984) *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985), *citing Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929). *Accord, TMT Trailer,* 390 U.S. at 424–425, 88 S.Ct. at 1163–1164; *Patel,* 43 B.R. at 504; *Central Ice Cream Co.,* 59 B.R. at 487; *In re Erickson,* 82 B.R. 97, 99 (D.Minn.1987). The Court has the responsibility of making an informed, independent judgment, apprising itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer,* 390 U.S. at 424, 88 S.Ct. at 1163.

FN1. Courts have used a "fair and equitable" standard and a "best interest of the estate" standard. The Seventh Circuit stated in *In re American Reserve Corp.,* 841 F.2d 159, 162 (7th Cir.1987), "[a]ny distinction between the 'best interests of the estate' and the 'fair and equitable' standards is of little consequence."

The Trustee, as proponent of the proposed settlement, has the burden of showing that the settlement terms are in the best interest of the estate. *In re Hallet,* 33 B.R. 564, 565–566 (Bankr. D.Me.1983). The Court may give weight to the opinions of the Trustee, the parties and their attorneys. *In re Blair,* 538 F.2d 849, 851 (9th Cir.1976). The Trustee's disapproval is a factor pointing to the impropriety of a compromise. *In re Paley,* 26 F.Supp. 952 (S.D.N.Y.1939). Proponents of settlement, and normally the Trustee in the first instance, must show the proposal is reasonable and that: 1) the settlement was not collusive, but was arrived at after arms-length negotiations; 2) that the proponents have counsel experienced in similar cases; 3) that there has been sufficient discovery of the underlying claims of parties to enable counsel to act intelligently; and 4) that the number of objectants or their relative interest is small. *Feder v. Harrington,* 58 F.R.D. 171, 174–175 (S.D.N.Y.1972).

Once there is a showing that the settlement should be approved, the burden then shifts to the objecting party who cannot oppose the settlement by merely demanding more proof. "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process.... [T]he objectors [must] have made a clear and specific showing that the vital material was ignored by the District Court." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 464 (2d Cir. 1974). The Court may approve a settlement over objections of some parties, as long as the settlement is in the best

interests of the estate as a whole. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128, 1138 (8th Cir. 1984) *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985).

 As a preface to the following analysis, the court notes that the court and the parties have developed a record—established by extensive testimony by the Trustee, by three attorneys versed in Federal Communications Commission law, and by the objectant's principal—which has established the information relied upon by the Trustee and his method of calculation of the reasonableness of the settlement; the convoluted nature of the Federal Communications Commission record with respect to the FCC license for an educational broadband service Station WLX 236 ("License"); circumstances relating to valuation of interests in the License both on the date of compromise and after; and assertions, particularly by the objectant, that an underlying agreement existed which could have been enforced by the Trustee to essentially guarantee the Trustee's recovery of interests in the License for the benefit of the estate. The court notes that although almost certainly witnesses in addition to those involved in hearings on the compromise would have been presented at a trial of the case had the Trustee not compromised, the Trustee's complaint has essentially been tried in this contested matter. It is important to remember that the focus of the court's determination of whether or not to approve the compromise *is not* the result that might have obtained had the case been tried, but rather the reasonable calculus of a range of settlement possibilities—based upon reasonable investigation and knowledge of pertinent facts—exercised by the Trustee at the time the compromise was entered into.

The parties had a great deal of difficulty separating trial of the case on its merits from determination of the contested matter regarding approval of the Trustee's compromise, and in fact the standards imposed by appellate courts upon review of compromises of this nature invite this type of approach by compromisor/compromisee and by an objectant. As the court specifically addressed to the parties throughout the course of the contested matter, the relevant time frame for consideration of whether or not the compromise should be approved is the date of the compromise itself, and what was known, could have been known, or should have been known at that point under a standard of reasonable investigation of circumstances. The court mentions the foregoing to note that many of the arguments advanced by the parties in their post-trial memoranda relate to the merits of the adversary proceeding rather than to the circumstances of the compromise itself.

The foregoing having been said, the following is the court's analysis.

The subject matter of the compromise was twofold: (1) whether or not the Chapter 7 bankruptcy estate of Fort Wayne Telsat, Inc. had an interest in the License, and, if so, the actual or potential value of that interest; and (2) whether the bankruptcy estate could recover certain costs associated with the License from the defendants. All of the parties agree that the Federal Communications Commission's record is the Rosetta Stone for translating communications license transactions into an intelligible statement of ownership and rights surrounding a license. All of the parties agree that Fort Wayne Telsat itself never utilized the License in any manner in its business in the context of transmitting anything.[3] All parties agree that Fort

---

3. In several places in its memorandum, JAS

states that the debtor "actually used the Li-

Wayne Telsat incurred approximately $350,000.00 of expenses in constructing facilities necessary for transmission under three different licenses, one of which was the License at issue. All parties agree that the debtor and Fort Wayne Public Television entered into a lease agreement by which the debtor leased excess capacity over the A-group and D-group of EBS licenses; there is no clear cut path of this nature to interests of Telsat in the C-group license at issue. All parties agree that it is extremely difficult to determine the value of an FCC license absent an actual transaction in which the rights to the license have been valued. All parties agree that the FCC record as to transactions involving the license is "a mess".

The bankruptcy case of Fort Wayne Telsat, Inc. was initiated by an involuntary petition filed on May 3, 2005 which sought to place the company in a Chapter 7 case. On June 7, 2005, an order of adjudication of bankruptcy was entered, and R. David Boyer was added to the case as the interim trustee. On June 16, 2005, the debtor filed a motion to convert the case from a case under Chapter 7 to a case under Chapter 11; this motion was granted by order entered on June 17, 2005. On June 16, 2005, the debtor filed an application to employ Grant F. Shipley as attorney for the debtor-in-possession; this application was granted by order entered on August 11, 2005. The debtor's schedules and statement of financial affairs, and other initial filings, were filed on July 29, 2005, with an amendment to Schedule F being filed subsequent to that date. On August 29, 2005,

the United States Trustee filed a motion to convert the case to Chapter 7, and this motion was granted by order entered on October 5, 2005. R. David Boyer was appointed Trustee of the resulting Chapter 7 case, and on October 7, 2005, his application to employ R. David Boyer II as counsel for the Trustee was approved. On October 7, 2005, Trustee Boyer filed an application to employ Grant F. Shipley as special counsel for the Trustee, for the stated purpose of assisting the Trustee in "reviewing, recovering and selling certain assets of the Debtor and/or of the estate, namely: broadcast licenses or leases". This application to employ Grant Shipley was granted by Judge Grant on November 28, 2005.[4]

On December 2, 2005, the Trustee, by special counsel Grant F. Shipley, filed the Trustee's Motion to Assume Executory Contracts and Leases (record entry # 149). Paragraph 1 of this motion sought to assume an "excess channel capacity lease agreement dated as of March 28, 1994 between Fort Wayne Public Television, Inc. and the debtor, and to the extent superseded and/or supplemented by an EBS excess capacity use and royalty agreement dated in November, 2004 pertaining to four C-group channels; together with a lease agreement, if any, dated March 28, 1994 as referred to in correspondence dated May 17, 2005 from WFWA PBS 39". Fort Wayne Public Television, Inc. filed an objection to this motion on December 19, 2005 (docket record entry # 157). In part pertinent to this

cense to broadcast programming for nearly ten (10) years" (JAS memorandum, page 28). The reference for this statement is page 358 of the trial transcript. Review of the transcript will conclusively show that Mr. Simon testified that Fort Wayne Telsat undertook action to construct facilities necessary for transmission under the License, but there is nothing whatsoever in this record—including page

358 of the trial transcript—that establishes that Fort Wayne Telsat ever broadcast anything under the authority of the License.

4. By order entered on September 23, 2005, the court had granted Attorney Shipley's motion to withdraw as counsel for the debtor-in-possession.

contested matter, paragraphs 3 and 4 of this objection stated the following:

3. The conditions precedent to make the Lease Agreement operative did not transpire inasmuch as the assignment of the license from the Trustees of Indiana University to PBS–39 which were to be the subject of the Lease Agreement did not occur. Pursuant to all information presently available to PBS–39 which information apparently has been confirmed by Trustee's general counsel, the Federal Communications Commission did not make the assignment despite PBS–39's diligent efforts and application for such assignment. As such, PBS–39 does not now have an assignment of the license subject of the Lease which the Trustee now seeks to assume for purposes of sale. PBS–39 asserts that it cannot lease to the Trustee something it does not have.

4. Further, after the involuntary petition, but prior to entry for the order for relief, on May 17, 2005, PBS–39 gave written notice to the Debtor of the termination of the Lease Agreement. This notice advised Debtor of the fact that despite PBS–39's diligent and reasonable efforts, the assignment of the license from the Trustees of Indiana University had not occurred. Accordingly, the lease subject of the Trustee's Motion had been terminated prior to the entry of the order for relief, and accordingly is not subject to assumption.

On April 27, 2006, the Trustee, through Attorney Shipley, filed an application to compromise the contested matter arising from the foregoing motion and the objection to it filed by Fort Wayne Public Television, Inc. (record entry # 214). The compromise between the Trustee and Fort Wayne Public Television, Inc. was approved by order entered on June 7, 2006 (record entry # 227). In part pertinent to this contested matter, this stipulation/order states:

2. The Lease Agreement relates to four channels (individually, an "ITFS Channel"), identified in said lease agreement as Channel C1 with band limits (megahertz) of 2548–2554; C2, with limits of 2560–2566; C3, with limits of 2572–2578; and C4, with limits of 2584–2590.

3. Fort Wayne Public Television, Inc. disclaims any further interests in said channels or leases, and consents to the assumption of such leases and the sale or transfer of said leases by the Trustee, all without any warranty or representation by Fort Wayne Public Television, Inc. that it validly holds, owns, leases or operates such leases or channels; but, to the extent it has rights in said channels, it consents to the assumption and assignment of such leases, rights and channels by the Trustee, subject to approval by the Federal Communications Commission.

4. Following entry of this Agreed Order, Fort Wayne Public Television, Inc. authorizes the Trustee to negotiate, contract and cooperate with the Trustees of Indiana University to complete the licensure of the four Channels or recognize the effective assignment of said channels or leases or channels to or on behalf of the Trustee or the Trustee's assignee.

5. Fort Wayne Public Television, Inc. authorizes the Trustee to prepare and file such papers with the Federal Communications Commission and/or any other regulatory authority to effectuate the transfer, license, assignment, or lease of Channels anticipated under the Trustee's motion, and any other subsequent assignment of said channels or leases as may be authorized by the Bankruptcy Court and the Federal Communications Commission, and consents to the Trus-

tee's proposed assumption and assignment thereof, without thereby warranting or representing that Fort Wayne Public television, Inc. in fact is the holder or lessee of said licenses, leases, or channels.

6. Fort Wayne Public Television, Inc. acknowledges that Trustee affirmatively represents that the Debtor has been using said channels and has been broadcasting on said channels since 1994 through and including the date of bankruptcy, and the Trustee continued to use said Channels and continued to broadcast on said channels until December of 2005, at which time notice was given that all broadcasting had ceased.

Throughout proceedings in this contested matter, this order has been referred to by the Trustee and by the other parties as a "quit claim" by Fort Wayne Public Television to the bankruptcy estate of Fort Wayne Telsat, Inc. of whatever rights Fort Wayne Public Television may have had to obtain assignment to it by Indiana University of the four channels referenced in paragraph 2 of the foregoing stipulation (the C-group channels/license). All parties in this contested matter agree that by operation of this order, the Trustee has all rights—whatever they may be—of Fort Wayne Public Television to seek to obtain assignment of the License from Indiana University.

On August 27, 2007, the Trustee filed an Amended Application to Sell Personal Property at Auction With Liens to Attach to Proceeds (record entry # 416). The focus of the sale was certain broadcast licenses. The foregoing application was approved by order entered on September 26, 2007 (record entry # 431). On December 5, 2007, the Trustee filed a Report of Sale of Certain of the Debtor's Assets Free and Clear of Liens and Interests (record entry # 450). The Trustee's

amended motion to approve this report was filed on February 29, 2008 (record # 478), and an order approving the report of sale filed on December 5, 2007 was entered on April 3, 2008 (record entry # 490). This sale, through the results of a competitive auction, resulted in a price of $4.7 million for the licenses which were the subject of the sale.

On December 15, 2006, the Trustee filed an Application by Trustee to Hire Cornerstone Wireless Communications, LLC (record entry # 294), which was approved by an order entered on December 18, 2006 (record entry # 295). Cornerstone was hired as a broker and consultant for the purpose of selling FCC licenses and negotiating disputed licenses. The company's president Russell H. Ritchie performed services for the Trustee, including in relation the License. Cornerstone, through primarily Mr. Ritchie, had performed consulting services and brokerage services for Fort Wayne Telsat pursuant to a contract dated November 15, 2004, primarily with respect to licenses other than the License. Prior to his hiring by the Trustee, Mr. Ritchie had reviewed certain matters relating to the License and had advised the debtors' principal James Simon of matters in relation to the License.

■ Prior to entering into the compromise, the Trustee had obtained a certification from the Federal Communications Commission which stated that the designated holder of the License on the Commission's records was Indiana University. At the time that he entered into the compromise, the Trustee had not caused a detailed search of the FCC's records in relation to the License to be made. Prior to his entry into the compromise, the Trustee had not had discussions with James Simon about matters relating to the License, and he was not aware that Indiana University was engaged in discussions

with Clearwire regarding transactions involving multiple licenses, including a lease of the License for an allocated amount for that lease of $4.1 million. Matters relating to the discussed transaction between IU and Clearwire in relation to the License were stated in the document which IU and IHETS have described in their memorandum of law as the "October 15 Proposal" (October 15, 2007).

Based upon his review of records of the debtor, the Trustee determined that an expenditure of approximately $350,000.00 had been made by the debtor with respect to construction of equipment and related expenses in relation to utilization of excess capacity of three channel groups held by Indiana University, subject to or potentially subject to leases to Fort Wayne Public Television. The Trustee allocated these expenses equally among the three channel groups, resulting in his estimate of the costs incurred by the debtor with respect to matters relating to the License to be $116,000.00.

By letter dated May 17, 2005 from PBS 39/WFWA–Fort Wayne (Fort Wayne Public Television, Inc.), under the signature of Robert Rhodos, President/GM to Mr. Jim Simon, as president of Fort Wayne Telsat, Inc., a meeting among Mr. Simon and the Officers of the Board of Fort Wayne Public Television, Inc. on May 11, 2005 was addressed. The letter stated the position of Fort Wayne Public Television, Inc. that efforts to obtain assignment of the License from the Trustees of Indiana University to Fort Wayne Public Television had been unsuccessful. By the third paragraph of that letter—referencing section 11.4 of the lease agreement dated March 28, 1994 between Fort Wayne Public Television, Inc. and Fort Wayne Telsat, Inc.—Fort Wayne Public Television terminated the March 28,

1994 lease agreement. The Trustee was aware of this document at the time the compromise was entered into. As noted above, the result of the debtor's motion to assume that lease agreement resulted in an agreed order by which the Trustee assumed the "excess channel capacity lease agreement" dated as of March 28, 1994 between Fort Wayne Public Television and the debtor. This agreement related to the excess capacity available for commercial use with respect to the four (4) C-group channels. The agreed order regarding the foregoing assumption provided the Trustee with any rights held by Fort Wayne Public Television, Inc. in relation to possible/potential assignment to it by the Trustees of Indiana University of the License with respect to these four channels. However, as reflected in disclaimers in the parties' stipulation, in its objection to the Trustee's motion to assume the lease agreement, Fort Wayne Public Television had taken the position that the arrangement between it and the Trustees of Indiana University regarding assignment of the License had been unsuccessful because the Federal Communications Commission had never approved that assignment, and that thus a condition precedent for the operative effect of the Excess Channel Lease Agreement between the debtor and Fort Wayne Public Television had not been satisfied.

At the time of the compromise, the Trustee was aware that the debtor itself could not obtain direct assignment of the License, and that in fact the License could only be actually held by a not-for-profit entity. The Trustee was aware of arrangements which were potentially available for "parking" the License in such an entity, but no estimate of the cost to the bankruptcy estate for effecting such an arrangement was obtained by the Trus-

tee.[5] The Trustee did not obtain an appraisal of the market value of the License at the time of the compromise.

During his discussions with Indiana University, the Trustee was made aware of the aggressive position of that party with respect to the Trustee's adversary proceeding, including the probability that any decision adverse to IU would be appealed to the United States District Court, and depending upon the outcome there to the United States Court of Appeals for the Seventh Circuit. He was also aware that any actions necessary to be undertaken with the Federal Communications Commission would be extremely time-consuming, potentially very expensive, and again subject to vigorous opposition by Indiana University.

Obviously, the Trustee and IU/IHETS assert that the Trustee's investigation was thorough and more than adequate to apprise the Trustee of circumstances surrounding the License and the compromise effected with respect to it.[6]

JAS asserts that the Trustee's investigation was inadequate, principally in three particulars:

1. The Trustee did not discuss matters relating to the License with James Simon, the debtor's principal.[7]

2. The Trustee did not obtain a detailed analysis of the FCC record.

3. The Trustee did not have a concrete perception of the value of the License and rights of the debtor associated with it as a "top figure" in the event the debtor was successful in the adversary proceeding, thereby obtaining interests in the License. In this context, it is asserted that had the Trustee conducted detailed discovery in the adversary proceeding, the Trustee would have been aware of the discussions between IU and Clearwire which allocated $4.1 million to the License in some context. JAS also apparently asserts that the Trustee should have obtained a formal appraisal of the value of the License as a best case scenario in the event the debtor was fully successful in the adversary proceeding.

Let's take the foregoing one at a time. In doing so, it must be borne in mind that the dispute between JAS and the Trustee regarding the compromise has encompassed discovery undertaken by JAS, the employment of an expert by JAS, and essentially a two-day trial involving three FCC experts, the Trustee, and James Simon which has fleshed out practically every issue that would need to be determined in the adversary proceeding. This court will focus on matters known to the Trustee at the time he entered into the compromise, and whether at that time enough information was known to cause the Trustee to form an educated analysis

---

**5.** In fact, there is no evidence in this record of any concrete estimation of any such cost.

**6.** The court will pause to note at this time that IU's original offer was $10,000.00 to settle all matters with the Trustee, but that through negotiations the offer was increased to the $100,000.00 amount which is the compromise sought by the Trustee and IU/IHETS to be approved by the court.

**7.** JAS has invited the court to review the decision of the Honorable Robert E. Grant in

*Big Horn Land & Cattle Co., LLC,* case number 09–10254 concerning the scope of a Trustee's investigation. The court read this decision, perhaps before JAS saw it; the court deems the decision to be well considered, but to have little relevance to the issues in this matter, and to have no controlling effect on this court. In *Big Horn,* the Trustee had not discussed the circumstances of state court litigation with the debtor's state court litigation counsel; in this case, the Trustee is the equivalent of the state court trial counsel.

of the calculus of success or failure in the adversary proceeding.

JAS first challenges the fact that the Trustee did not have discussions with James Simon with respect to transactions regarding the License. In preparing this memorandum, the court reviewed the entire record in case number 05–12177. The court notes that JAS and James Simon have been extremely litigious in matters that relate to the Chapter 7 case, in terms of objecting to a multitude of motions filed in the case. This is somewhat understandable in view of the fact that JAS is—on the face of the record as it presently stands—by far the largest creditor in the case, and that it is therefore seeking to protect its interests as a general unsecured creditor with respect to any monies recovered by the Trustee and distribution of those monies to any class of creditors having priority over general unsecured creditors. However, it is apparent to the court that James Simon has a totally different view of administration of this bankruptcy case than do many other people or entities involved in it, including matters relating to this adversary proceeding and the contested matter arising from the Trustee's attempted compromise of it. This is by way of saying that—unlike some Chapter 7 cases in which the debtor is a partner to the Trustee—in this case the debtor's principal—through JAS—has been a constant opponent of the Trustee. It is therefore not surprising that the lines of communication between the Trustee and James Simon were not totally open. That being said, had the Trustee had discussions with James Simon about his view of matters relating to the License, what the Trustee would have discovered was that Mr. Simon contends that an agreement was arrived at during a multi-party telephone conversation among Fort Wayne Public Television, IHETS or IU, and Mr. Simon as a representative of Fort Wayne Telsat which forms a basis for the Trustee to conclusively establish a case in the adversary proceeding. What the record discloses is that Mr. Simon in his testimony on March 5, 2009 could not state the date of this conversation, nor even an approximation of a concrete date; he could not definitively state the parties involved in the conversation apart from himself; he couldn't state any concrete agreement that was arrived at as a result of the conversation; and he couldn't explain why detailed written agreements were entered into with respect to two other Group licenses but were not entered into with respect to the C-group License.

In the context of not discussing matters with James Simon, the court concludes that based upon the information known to the Trustee, it was not necessary to discuss matters with James Simon, and had the Trustee done so, he would not have obtained any substantive information which the court deems could have materially altered the Trustee's analysis.

JAS faults the Trustee for not obtaining a detailed examination of the FCC record. The record conclusively establishes—and no party disputes it—that the FCC record, as certified by the FCC, states that IU is the holder of the License. The record conclusively establishes—and no party can legitimately dispute it—that Fort Wayne Public Television, as the purported assignee of the License, had definitively taken the position that attempts to assign the License from IU to it were unsuccessful, and that any transaction between it and IU regarding assignment of the License had been unsuccessfully concluded. Three FCC experts testified in detail as to the documents in the FCC record and the interpretation to be given to the record as a result of those documents. Two of those experts—Russell Ritchie and Robert J. Rini—were called as witnesses on behalf

of entities seeking to uphold the compromise, while the third—Donald Evans—was called as a witness on behalf of JAS. All three experts stated that the transactions evidenced by the FCC record were essentially unique in their experience. All three experts—through a process of piecing together various applications and FCC notices regarding the applications, and letters and filings with the FCC from interested parties in regard to the applications—could do no better than state an opinion as to the result of all of the foregoing documents in the FCC record as to actual assignment of the License to Fort Wayne Public Television. Mr. Ritchie and Mr. Rini, particularly Mr. Rini, stated the opinion that the "mess" of an FCC record established that originally a two-part application had been filed, comprised of an application for authorization to construct facilities and an application for assignment of the License. Mr. Evans essentially agreed with this analysis. The witnesses then departed with respect to transactional documents on the FCC record following this application. The experts for the proponents of the compromise, particularly Mr. Rini, stated that the record established that the FCC had deemed the original two-part application to have been supplanted by an amended application which related solely to construction of facilities, and that because the FCC deemed the request for assignment to have been supplanted by solely a request for authorization for construction, no action had ever been taken by the FCC with regard to the requested assignment, and the FCC had essentially deemed the assignment request to have been removed from its consideration. This conclusion was bolstered by the fact—acknowledged by all three experts—that the FCC never issued a public notice regarding the assignment in the manner customarily done by the agency. Mr. Evans stated at best that the FCC

record supported that Fort Wayne Public Television is the licensee, a conclusion which Fort Wayne Public Television itself has disavowed.

Having thoroughly reviewed the testimony of the three expert witnesses and the FCC record, it is undisputed that the Federal Communications Commission has certified, and will certify, that on its records the licensee of the License is Indiana University. Whether it should have done so or not, the FCC appears to have considered the amended application to be a complete substitute for the original application, and thus to have deemed the only matter before it to have been the application for authority to construct facilities, an application which was granted. A focus of JAS' opposition to the motion in compromise is that the Trustee has ammunition, through the use of the "quit claim" assignment to the bankruptcy estate of Fort Wayne Public Television's rights to obtain an assignment of the License from IU, to compel the result that the License has been, or should be, assigned from IU to Fort Wayne Public Television. This assertion ignores the undisputed fact that Fort Wayne Public Television has taken the public position, including by means of materials filed in case number 05–12177, that it has no rights to enforce an assignment from IU. JAS' position ignores the fact that the Federal Communications Commission has certified that the licensee at this time is Indiana University. JAS' position ignores the extensive expenditure of time and money that would be involved in even correcting a clear record with the Federal Communications Commission let alone the one presented here. JAS' position in significant part relies upon an alleged enforceable oral contract entered into in a 10–15 minute telephone conversation, the principal evidence of which is a witness who pretty much could not establish a

foundation for admission of the *fact* that the telephone conversation took place.

At the time the compromise was entered into, the Trustee had obtained a certification of the FCC record that established that Indiana University was the holder of the License. He had also been apprised that Indiana University would aggressively oppose any assertion that this record was erroneous and would appeal any decision adverse to its position. The Trustee also knew that Fort Wayne Public Television took the position that no assignment had taken place, and that it had no rights to compel one to take place.

Based upon the foregoing, the court determines that the Trustee's investigation as to the status of the FCC record was entirely adequate. Moreover, had the Trustee expended additional estate resources—as have now been required by JAS' objection to the compromise—he would not have discovered anything material that would have had to have been taken into account in determining compromise of this adversary proceeding.

JAS also faults the Trustee for not obtaining an appraisal of the value of the License at the time the compromise was entered into, based upon the assumption that the debtor had a "clear path", so to speak, to obtaining interests in the License through a combination of asserting the rights of Fort Wayne Public Television and its own rights under its lease agreement with Fort Wayne Public Television. While the record as to the Trustee's projection of the value of the License as an alternate recovery value is a little sketchy, it is fair to say that the Trustee placed the high-end value of the debtor's interests in the License at approximately $600,000.00. The Trustee was not aware of the discussions between Clearwire and IU regarding interests in the License and a potential valuation of those interests at $4.1 million.

All three experts stated—*based upon the assumption that the debtor had been determined to have interests in the License susceptible to commercial sale*—that the upper-end valuation of the License could have been higher than that used by the Trustee.

It is undisputed that the Trustee did not have the transactional details of a potential deal between IU and Clearwire at his disposal before he entered into the compromise. It is also undisputed that the Trustee did not obtain a formal appraisal of the value of the License on a best case scenario basis, i.e., the debtor had the rights to the License to the extent the debtor was able to sell or lease those rights. However, having reviewed the testimony of three FCC experts, it is clear to the court that the arrangements being addressed between IU and Clearwire do not define a value for the License in the hands of the debtor. First, the debtor is not a not-for-profit entity, and therefore, unlike Fort Wayne Public Television, it would have had to place the License in the hands of a third party in order to commercially market excess capacity, a placement which would have involved a lease payment which no party in this case defined with any precision as to amount. Additionally, the IU/Clearwire negotiations occurred at a critical point in the market, which at the time of the compromise with the Trustee may well have evaporated, at least to a significant extent. Finally, the court accepts the view of the proponents of the compromise that the amount allocated by Clearwire to this License, as part of a potential multi-license transaction, was artificially high, based upon the perceived risk factor involved in Clearwire's obtaining the ability to broadcast under the License.

Again, it is undisputed that in arriving at his "best case" scenario, the Trustee did

not obtain a definitive valuation of ultimate "best case" value of the License to the estate. However, based on the record made in this contested matter, had he done so, he would have expended estate resources for information which would not have been significantly material to a necessary evaluation of settlement of the case. The problem with JAS' analysis of the "probably" high-end value is that it assumes that the Trustee had a "clear path" to the interests of Fort Wayne Public Television regarding assignment of the License—despite the FCC record; despite the aggressive litigating position of Indiana University; and despite the position of Fort Wayne Public Television itself that the assignment had never been effected and was not viable. Again, JAS' proposed litigation position for the Trustee is based on a nebulous telephone conversation which occurred years ago among James Simon and persons whom James Simon cannot clearly designate, which resulted in a nebulous agreement without particular details, in a circumstance in which prior and other transactions among the parties had resulted in detailed written documents. Based upon the investigation by the Trustee and the facts known to him at the time he entered into the compromise, the expenditure of bankruptcy estate resources to obtain an actual appraisal of the License under a best case scenario basis would not have been justified. Moreover, because the value accorded to the License in discussions between Clearwire and IU does not come close to mirroring the circumstances which would have existed had the debtor actually held the interests that IU asserted with respect to its negotiations with Clearwire, information about that transaction would not have been a materially significant addition to the Trustee's arsenal with respect to settlement of this case.

The court concludes under the circumstances of this case that the Trustee's investigation was adequate to provide the Trustee with information necessary to make an informed decision as to the parameters of compromise.

The foregoing discussion somewhat foreshadows the court's determination as to the other issues raised regarding the compromise. In their Post–Trial Memorandum, IU/IHETS has identified the issues before the court to be the following:

1. The Trustee's knowledge prior to entering into the proposed settlement;

2. The reasonableness of the Trustee's pre-settlement investigation; and

3. Whether the proposed settlement is in the best interest of the estate—that is, whether the proposed settlement amount falls within a reasonable range of potential litigation outcomes.

Post–Trial Memorandum of IU/IHETS, page 2. Issues 1 and 2 are essentially the same, and essentially mirror the issues presented by pages 18–24 of the Post–Trial Brief of JAS Partners. As discussed above, the court has determined these issues in favor of approving the compromise.

■ The remaining issue is whether, based upon the record, the compromise meets the "best interests of the estate" test in relation to a comparison of the value of the settlement with the probable costs and benefits of litigating, or phrased another way, is the compromise "fair and equitable" in relation to the bankruptcy estate.

■ In determining the substantive validity of the compromise, it must be borne in mind that calculations of the "high-end" and "low-end" probable/potential outcomes are not rocket science, and that some latitude is to be granted to the

Trustee in arriving at these calculations, assuming the Trustee had adequate facts to make that calculation—as the court has determined in this case he did. Again, the real focus of analysis is anticipated results at the time the compromise was entered into, and not probable or potential results after a min-trial has been held regarding the merits of the case, which is the circumstance here.

In his testimony, Trustee Boyer stated that his analysis of compromise was based upon a "Lloyd's of London" analysis somewhat essentially taught by his law professor at the University of Pennsylvania. Under this analysis, one first arrives at an anticipated best case scenario and an anticipated worst case scenario. One next ascribes a percentage to the probable outcome in order to determine a gross recovery figure. One then factors in the costs and time expenditures in arriving at ultimate disposition of the dispute.

Trustee Boyer primarily approached the compromise as an issue of recovery of costs for physical construction of facilities incurred by the debtor. Based upon information available to him, he computed the costs incurred by the debtor for construction of facilities for three license transactions at $350,000.00, and the amount allocable to construction costs for the one License out of three at $116,000.00. With respect to the calculus Trustee Boyer undertook with respect to valuation of potential recovery of interests in the License itself, we'll use the figure of $600,000.00 as the perceived high-end recovery value on the License (Trial Transcript, pages 107–108). Trustee Boyer then assigned a 30% probability of success on the merits to these values, but not really. If one reads Trustee Boyer's testimony carefully, one will be left with the conclusion that he felt he had no prospects for success in obtaining any interest in the License itself, and

that his major recovery potential was on a theory of promissory estoppel to recover costs incurred by the debtor for actual physical construction of transmission facilities. Thus, giving Trustee Boyer's analysis its due, he computed the actual high-end settlement value at essentially $116,000.00, the low-end value at approximately $35,000, and he compromised for $100,000.00. JAS really doesn't dispute the allocation of construction costs, and thus really doesn't dispute the Trustee's analysis as to recovery of those costs. JAS disputes the value assigned by the Trustee to the estate's potential interests in the License, and essentially contends that the compromise does not take into account the relative probability of success of the estate's obtaining of rights/interests in the License.

First, there is no dispute that the total expenditure by the debtor for facility construction costs with respect to three licenses was $350,000.00. It is reasonable to allocate one-third of that expense to the License. The Trustee obviously rounded one-third of $350,000.00 to $116,000.00. The court finds that the Trustee's estimate of the maximum recovery value on this element of his claim is reasonable.

JAS has invited the court to essentially make a decision on the merits of its contentions concerning the estate's interests in the License, and the Trustee's calculation of his "high-end value" based on potential value of the License to the estate. So be it.

As to the value of the License itself as a factor in the high-end value to be considered by the Trustee, the court finds that the Trustee could legitimately have assigned no value to this component. In order to succeed, the Trustee could have posited two theories. First, that the transactions on the FCC record establish that the assignment by IU to Fort Wayne

Public Television had actually been approved, and thus that by virtue of the estate's holding of all rights of Fort Wayne Public Television with respect to the assignment, the estate actually held rights to the License itself. Because the debtor is not a not-for-profit entity, an arrangement would have had to have been made with such an entity for it to hold the License, and then to enter into an excess capacity lease of the nature of that which the debtor alleges existed between Fort Wayne Public Television and Fort Wayne Telsat for sale of the excess capacity on the open market. So, the first theory is that the debtor, as successor-in-interest to the rights of Fort Wayne Public Television, is the actual assignee of the License. The first problem with this argument is that the FCC has certified that its record states that IU is the licensee. We can now go through a very convoluted process of discussing a number of documents on the FCC record, and we can ascribe all kinds of conclusions—as have the three experts called at the hearings—to what that record actually shows. The bottom line is that the record shows that the licensee is Indiana University. The bottom line is that Indiana University would seriously and expensively and time-consumingly contest any assertion to the contrary. The bottom line is that *only the FCC* can determine its record as to the actual licensee as disclosed by the convoluted materials in its record. The bottom line is that determination of that matter by the FCC would take an extraordinary amount of time against a relatively entrenched determination by the agency, and would in all probability—if determined adversely to Indiana University—result in a series of appeals which would take years to resolve.

But let's not stop there.

As all parties acknowledge, the court cannot make a definitive determination binding upon the FCC as to its determination of the actual licensee. While the experts testified that in all probability an order of a court establishing a licensee and ordering assignment of the license to the licensee thus concluded would be upheld and honored by the FCC, no one could say that with absolute certainty. Particularly, no one could say how long it would take the FCC to act on any court order. Thus, the element of time and expense to clarify the FCC record on the theory that Fort Wayne Public Television is actually the assignee of the License would be extreme. More importantly, if the court were called upon to make a decision based upon the record before it as to the identity of the actual licensee as determined from the FCC record, the court would determine that the FCC deemed the initial two-part application to have been entirely superseded by the amended application for authorization for facility construction. As a result, there was nothing pending before the FCC, in its view, as to assignment of the License itself. Up to a certain point, IU and Fort Wayne Public Television sought to have the FCC approve the assignment. Those efforts stopped well before the litigation commenced by the Trustee. It is particularly telling that neither Fort Wayne Public Television nor JAS, as (as it argues) a purported third party beneficiary of a contract between IU and Fort Wayne Public Television [8], filed any formal proceeding before the FCC addressed to the assignment of the License. It is also particularly telling that Fort Wayne Public Television, as the purported assignee, stated definitively that matters relating to the

---

8. The principal contracting parties terminated the agreement; query, what contract was left for Telsat to enforce as a third party?

assignment were unsuccessful, and that it had no rights to seek an assignment. Thus, were the court to determine the theory of rights to the License under the FCC's record, the court would determine that only the FCC can determine that. If, sitting as a reviewing court with respect to a decision of the FCC under laws applicable to review of agency action, the court were asked to review a determination by the FCC that the actual licensee is Indiana University, based upon the record submitted to the court the court would affirm the determination of the FCC. This is all by way of saying that even if the Trustee had caused a detailed review of the FCC record to have been made prior to his compromise decision, it would have been reasonable for the Trustee conclude that he had no chance of success regarding determining that Fort Wayne Public Television was the actual license holder in the eyes of the FCC.

The other theory espoused by JAS is that agreements/arrangements exist which would allow the Trustee to compel IU to complete the assignment of the License to Fort Wayne Public Television. This argument fails as well, if the court were called upon to decide it. It is clear from the record that the excess capacity lease agreement between Fort Wayne Public Television and Fort Wayne Telsat was conditioned upon successful assignment of the License to Fort Wayne Public Television by IU. It is also clear that IU and Fort Wayne Public Television intended for that assignment to take place. In relation to the excess capacity lease between Fort Wayne Public Television and Fort Wayne Telsat, it is clear that the assignment did not take place, and that that contract is a nullity. The record establishes that IU and Fort Wayne Public Television acted for an extended period of time on the assumption that the assignment was viable. The record also establishes that at some point—not determinable precisely from evidence at the hearings—IU and Fort Wayne Public Television decided that the assignment would not be pursued. This fact is more than demonstrated by the posture adopted by Fort Wayne Public Television in litigation commenced regarding assumption by the Trustee of the excess capacity lease between it and Fort Wayne Telsat. So, the Trustee inherits the rights of Fort Wayne Public Television to enforce an assignment against IU, under circumstances in which the assignee whose rights have been assumed has taken the position it has no right to compel assignment. In response, JAS contends there is a separate oral agreement among IU/IHETS, Fort Wayne Public Television and Fort Wayne Telsat regarding the assignment of the License, an agreement which is oral (as documentation indicated the original assignment agreement between Fort Wayne Public Television and IU was). This critical agreement was established during a 10–15 minute telephone conversation among James Simon—the proponent of the agreement at the hearings—and parties whom he could not conclusively identify, and resulted in terms of an agreement which he could not definitively state. And this is in circumstances in which other agreements among the same parties regarding two other licenses were documented in writing in detail. Moreover, if in fact this conversation took place and an agreement was in fact arrived at, according to James Simon's testimony, the person involved on behalf of IU/IHETS was a representative of IHETS, not of IU. As IU/IHETS points out in its legal memorandum, a determination of the nature of that arrived at by this conversation would have to be approved by the Board of Trustees of Indiana University, a fact which the court will infer from the record was known to James Simon, and

therefore a fact which will not support an agreement entered into on the theory of apparent authority exercised by an agent.

Based upon what was reasonably known at the time the Trustee entered into the compromise, the court determines that the relative value to be assigned to any recovery by the estate of interests in the License itself could reasonably have been zero. Based upon the record now before the court, the court determines that an estimate of zero would have been a very good estimate.

Based upon the foregoing, the reasonable best case estimate of the Trustee for recovery was $116,000.00. The Trustee assigned a 30% probability of recovery to that amount, and thus, in the Trustee's eyes, the low-end value of this case could reasonably have been approximately $35,000.00.

The court concludes that the Trustee determined that his best case recovery was $116,000.00, and that this determination was reasonable. The Trustee determined that he had a 30% probability of recovering that amount, and this determination was reasonable. All of this leaves aside the extensive expense and time consumption of litigating a number of complicated issues, all but one of which—based upon the record the court has seen thus far—would probably be resolved against the Trustee. Based upon the information that the Trustee had at the time of entering into the compromise, determination that the results of recovering *any* value for the estate with respect to establishing interests of the estate in the License itself—either directly or through exercise of the rights of Fort Wayne Public Television—was reasonably placed at zero.

The court thus concludes as follows:

A. Under the circumstances of this case, the Trustee's investigation of circumstances relating to the subject of the compromise was adequate.

B. The Trustee's calculation of the potential value of recovery by the estate with respect to the subject of the contested matter was reasonable.

C. The value of the settlement is reasonably equivalent to the value of claims surrendered.

D. The Objection to Joint Motion to Approve Settlement filed by JAS Family Limited Partnership on April 7, 2008 is denied.

E. The Amended Joint Motion to Approve Settlement filed on March 18, 2008 is approved.